**1–800 CONTACTS, INC., Plaintiff,**

**v.**

**WHENU.COM and Vision Direct, Inc., Defendants.**

**No. 02 Civ. 8043(DAB).**

United States District Court, S.D. New York.

Dec. 22, 2003.

---

Marshall R. King, Terence P. Ross, Gibson, Dunn & Crutcher, L.L.P., New York, NY, for the Plaintiff.

Arnold Paul Lutzker, Carl Herman Settlemyer, Maureen Cohen Harrington, Lutzker & Lutzker, L.L.P., Washington, DC, Celia Goldwag Barenholtz, John A. Morris, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Defendant WhenU. com.

· James D. Jacobs, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY, for Defendant Vision Direct, Inc.

*Opinion*

BATTS, District Judge.

Before the Court is a Motion for a Preliminary Injunction by Plaintiff 1–800 Contacts ("1–800 Contacts" or· "Plaintiff") to enjoin Defendants from delivering to computer users competitive "pop-up" Internet advertisements, in violation of federal and state copyright, trademark, and unfair competition laws. For the reasons set forth herein, Plaintiff's motion is GRANTED in part.

## I. BACKGROUND

### A. Procedural Background

On October 9, 2002, Plaintiff filed this action with ten claims for relief.[1] With its Complaint, Plaintiff also filed a Motion for Preliminary Injunction,[2] to enjoin Defendants from: 1.) Placing, or causing any other entity to place, advertisements of any kind on any copy of Plaintiff's website, without the express consent of the Plaintiff; 2.) Altering or modifying, or causing any other entity to alter or modify, any copy of Plaintiff's website in any way, including its appearance or how it is displayed; 3.) Infringing, or causing any other entity to infringe, Plaintiff's copyright; 4.) Making any designations of origin, descriptions, representations or suggestions that Plaintiff is the source, sponsor or in any way affiliated with Defendant Vision Direct's website and services; 5.) Acting in any manner that causes Defendants' products, services, websites, or advertisements to be in any way associated with Plaintiff's products, services, or website, including, but not limited to, any means of marketing advertising, or agreements with third parties likely to induce the belief that Defendants or Defendants' websites, advertisements, products or services are in any way associated connected, or affiliated with, or licensed or authorized by Plaintiff; 6.) Infringing, or causing any other entity to infringe, Plaintiff's trademarks and/or service marks rights; 7.) Unfairly designating the origin of Defendant Vision Direct's website and services, or otherwise creating confusion regarding the origin of Defendant Vision Direct's website and services; 8.) Unfairly competing with Plaintiff in any manner; 9.) Acting, or causing another entity to act, in any manner likely to dilute; tarnish, or blur the distinctiveness of the 1–800 CONTACTS marks; 10.) Causing a likelihood of confusion or injuries to Plaintiff's business reputation; 11.) Interfering with Plaintiff's reasonable business expectations. (Plaintiff's Proposed Order, filed October 9, 2002.)

On October 22, 2002, the Court held a conference call with the parties, during which the parties agreed to cease the allegedly offending "pop-up" advertising conduct until a preliminary injunction hearing. The parties agreed to allow Defendants sufficient time to conduct a consumer survey to rebut Plaintiff's survey evidence and scheduled a Preliminary Injunction hearing for February 7, 2003.[3]

---

1. Plaintiff's claims included: 1.) Trademark infringement, in violation of the Section 32(1) of the Lanham Act, 15 U.S.C. § 1114; 2.) Unfair Competition, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); 3.) False designation of origin, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); 4.) Trademark dilution, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); 5.) Cybersquatting, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(d); 6.) Copyright infringement, in violation of the Federal Copyright Act, 17 U.S.C. §§ 101, et seq.; 7.) Contributory Copyright Infringement, in violation of the Federal Copyright Act, 17 U.S.C. §§ 101, et seq.; 8.) Dilution of trademark and/or injury to business reputation, in violation of N.Y.G.B.L. § 360–1; 9.) Common law unfair competition; and 10.) Tortious Interference with Prospective Economic Advantage.

2. With its Preliminary Injunction Motion, Plaintiff filed a Memorandum of Law ("Pl. October 9, 2002"), supported by the Declaration of Jason Mathison ("Mathison Dec.") and the Affidavit of Amy Barrier ("Barrier Aff.").

3. In a follow-up call on October 24, 2002, the parties notified the Court that they had formalized a stipulation, under which the parties ceased pop-up advertising activities on each others' websites, to "continue in effect through a hearing by this Court on Plaintiff's Motion for a Preliminary Injunction." (October 29, 2002 Stipulation and Order at 4). The Court signed the Stipulation on October 29, 2002 and reset the Preliminary Injunction hearing date to February 24, 2003.

On January 7, 2003, the Court ordered, by memo-endorsement of a letter request from Defendant WhenU.com ("WhenU" or "WhenU.com"), an adjournment of the Preliminary Injunction Hearing in this case to March 18, 2003. (Memo–Endorsement of Def. Jan. 6, 2003.) On January 31, 2003, Defendant WhenU.com filed its Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction ("WhenU.com Jan. 31, 2003"),[4] and Defendant Vision Direct filed its Memorandum in Opposition as well ("Vision Direct Jan. 31, 2003").[5]

On February 28, 2003, Plaintiff filed its Memorandum of Law in Reply to Defendant WhenU.com's Opposition and its Memorandum of Law in Reply to Defendant Vision Direct's Opposition ("Pl. Feb. 28, 2003").

Evidentiary hearings and argument were heard on March 18, March 19, April 8, and April 10, 2003. The Court incorporates herein the record of the evidentiary hearings and argument. Relevant hearing testimony and arguments are set forth in more detail below.[6]

## B. Factual Background

The undisputed facts in this section, with the legal conclusions and facts found in the Discussion section, *infra*, constitute the Court's Findings of Fact and Conclusions of Law for purposes of Rule 52(a).

### 1. The Parties

Plaintiff 1–800 Contacts, Inc. ("1–800 Contacts") sells and markets replacement contact lenses and related products through its website, located at http://www.1800Contacts.com, and also through telephone and mail orders. (Declaration of Jason Mathison ("Mathison Dec.") ¶ 4; Plaintiff's October 9, 2002 Memorandum ("Pl. Oct. 9, 2002") at 3). Plaintiff has registered the "WE DELIVER, YOU SAVE" mark with the United States Patent and Trademark Office ("USPTO"), and has filed for registration of the mark "1–800 CONTACTS" and the 1–800 CONTACTS logo. (Complaint ("Compl.") Ex A–C; Pl. Oct. 9, 2002 at 4.) Plaintiff has expended considerable sums on marketing these marks; in 2001, 1–800 Contacts spent $27,118,000 on marketing. (Mathison Dec. ¶ 7; Pl. Oct. 9, 2002 at 4.) Since the founding of 1–800 Contacts in 1995, Plaintiff has continuously used its service marks to promote and identify its services in the United States and abroad. (Mathison Dec. ¶ 6) Plaintiff's sales have grown from $3,600,000 in 1995 to $169,000,000 in 2001. (Mathison Decl. ¶ 8; Pl. Oct. 9, 2002 at 3.)

Plaintiff is the sole owner of the 1–800Contacts.com website. (Mathison Dec. ¶ 5; Pl. Oct. 9, 2002 at 4.) Plaintiff registered its copyright to the 1–800Contacts.com website with the Copyright Office of the United States Library of Congress on October 2, 2000.[7] (Compl., Exh. D.) Over 221,800 people visited Plaintiff's

---

4. Defendant WhenU.com's Opposition was supported by the Affidavit of Avi Naider ("Naider Aff."), the Declaration of Dr. Jacob Jacoby ("Jacoby Dec."), and the Declaration of Dr. John A. Deighton ("Deighton Dec.")

5. WhenU.com's Opposition was supported by the Declaration of Ian Mummery ("Mummery Dec.").

6. References to the Preliminary Injunction hearing transcript are denoted by "Tr."

7. Appended to Plaintiff's Complaint is Certificate of Registration No. VA–1–032–662, which provides, *inter alia,* that the "1800 Contacts Web site" was completed in the year 2000, that the work was first published on March 1, 2000, and that the effective date of the copyright registration was October, 2, 2000. (Compl., Ex. D.)

website in the month of September, 2002.[8] (Mathison Dec. ¶ 9; Pl. Oct. 9, 2002 at 4.)

Defendant Vision Direct, Inc. sells and markets replacement contact lenses and related products through its website, located at http://www.visiondirect.com. (Mummery Dec. ¶ 2; Vision Direct Jan. 31, 2002 at 2.) Vision Direct and 1–800 Contacts are competitors. *Id.* Defendant Vision Direct has registered and maintains a registration in the domain name [9] *www.www1800Contacts.com.* (Barrier Aff. Ex. A.)

Defendant WhenU.com is a software company that has developed and distributes, among other products, the "Save-Now" program, a proprietary software application. (Tr. at 34; Naider Aff. ¶ 22.)

### 2. The Internet and the Windows Operating Environment

Since Plaintiff's claims arise from alleged anti-competitive and infringing action by Defendants through the Defendants' use of proprietary software that is distributed to computer users, a brief explanation of the Internet, the computer operating environment and associated terms and definitions is helpful. These facts are not in dispute.

The Internet is a global network of millions of interconnected computers. (Compl.¶ 20.) With a computer that is connected to the Internet, a computer user can access computer code and information that is stored on the Internet in repositories called "servers." (Tr. at 137–38.) Much of the information stored in servers on the Internet can be viewed by a computer user in the form of "webpages," which are collections of pictures and information, retrieved from the Internet, and assembled on the user's computer screen. (Compl.¶ 20.) "Websites" are collection of webpages that are organized and linked together to allow a computer user to move from webpage to webpage easily. (*Id.*) A single website may contain information or pictures that are stored on many different servers. (Tr. at 139–140.)

To gain access to the Internet, a computer user generally connects to the Internet using an internet service provider ("ISP").[10] (Tr. at 136.) The ISP provides access to the Internet, which allows the user's computer to communicate with the Internet. (Tr. at 136.) Once a connection to the Internet has been established through an ISP, a user may "browse" or "surf" the Internet by using a software program called an Internet browser ("browser"). (Tr. at 136.) Microsoft Internet Explorer is one example of a browser program.[11] (Tr. at 135.) Through the browser, a user retrieves information located on Internet servers.[12] (Tr. at 138.)

To retrieve information from the Internet, a user may type the address [13] of a

---

**8.** Mr. Mathison's Declaration states that "Approximately 221,864 people visited the website in the past month"—his declaration was dated October 4, 2002.

**9.** *See* fn. 13, *infra.*

**10.** Examples of ISPs include Earthlink, Verizon, NetZero, America Online.

**11.** Other examples of browser programs include Netscape Navigator, Opera, and Mozilla; in addition, many residential ISPs like Earthlink and America Online provide their own proprietary browsers.

**12.** With appropriate software, any computer that is connected to the Internet can act as a server, by providing access, via the Internet, to other computer users who are connected to the Internet. Thus, there are many, many servers acting as "hosts" for information that is found on the Internet.

**13.** The Second Circuit has explained that

Web pages are designated by an address called a domain name. A domain name consists of two parts: a top level domain and a secondary level domain. The top level domain is the domain name's suffix. Currently, the Internet is divided primari-

website into the web browser—the user's computer will then request information from the server or servers on which the website resides,[14] and then will access the pertinent information on those servers. (Tr. at 137–38.)

Many computer users ("users") access the Internet with computers that use the Microsoft Windows operating system ("Windows"). Windows allows a user to work in numerous software applications simultaneously. (Naider Aff. at 4.) In Windows, the background screen is called the "desktop." When a software program is launched, a "window" appears on the desktop, within which the functions of that program are displayed and operate.

(Naider Aff. at 4.) A user may open multiple windows simultaneously, allowing the user to launch and use more than one software application at the same time. Individual windows may be moved around the desktop, and because the computer screen is two-dimensional, one window may obscure another window, thus appearing to be "in front of" another window. (Naider Aff. at 4–5.)

A "search engine" is a website (or in some cases, a software program) that a computer user can use to find information on the Internet.[15] Typically, a computer user will type in a word or words describing what is sought, and the search engine will identify websites and webpages that contain those words.[16]

---

ly into six top level domains: (1) .edu for educational institutions; (2) .org for non-governmental and non-commercial organizations; (3) .gov for governmental entities; (4) .net for networks; (5) .com for commercial users, and (6) a nation-specific domain, which is .us in the United States. The secondary level domain is the remainder of the address, and can consist of combinations of letters, numbers, and some typographical symbols. To take a simple example, in the domain name "cnn.com," cnn ("Cable News Network") represents the secondary level domain and .com represents the top level domain. Each domain name is unique. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 492–93 (2d Cir.2000). In common usage, an "URL" (Uniform Resource Locator) is the location for a specific webpage, such that if the URL were entered into a browser, the webpage would appear. By contrast, a "domain name" is often used to refer to the URL for the "front" or "home" page of a website. Thus, the domain name for the 1–800 Contacts is www.1800Contacts.com, while the URL for a specific webpage within the 1–800 Contacts website might be *www.1800Contacts.com/xxxxx.xxx*, with the "x's" providing specific locations within the 1–800 Contacts domain. The URL of a webpage may be entered directly into a web browser to retrieve that webpage.

14. Given that a single website contains text and information located on multiple servers, when a user's computer accesses a single website, the computer may be receiving information from several different servers. (Tr. at 140.) Avi Naider, CEO of WhenU analogized accessing a website to fishing:

> The way a desktop computer actually operates is it communicates with multiple servers at the same time. So it's not a one-to-one thing. A desktop, even in the 1–800 Contacts web page, the text for the page might come from one server that might be owned by the 1–800 Contacts company, the images on the webpage might come from a commercial server somewhere that's set up to deliver images. Different elements on a desktop can come from lots of different places. Maybe the best way to describe a desktop is you've got lots of open fishing lines. Once you establish a connection into the Internet, you've sort of got your boat out into the ocean, and you can toss out lots of different lines to lots of different places and collect information from lots of different places.

(Tr. at 139.)

15. Examples of search engines are www.Google.com, www.Yahoo.com and www.AskJeeves.com.

16. The Second Circuit has defined the term "search engine" operationally:

> A search engine will find all web pages on the Internet with a particular word or phrase. Given the current state of search engine technology, that search will often

### 3. The SaveNow Program

The following description of the operation and function of the SaveNow software is not in dispute. The SaveNow program is computer software that only operates in the Microsoft Windows operating system. (Tr. at 27.) The SaveNow software, if installed, resides on individual computer users' computer desktops. (Tr. at 34; Naider Aff. ¶ 22.) When a computer user who has installed the SaveNow software (a "SaveNow user") browses the Internet, the SaveNow software scans activity conducted within the SaveNow user's Internet browser, (Naider Aff. ¶ 25), comparing URLs, website addresses, search terms and webpage content accessed by the SaveNow user with a proprietary directory,[17] using algorithms contained in the software. (Tr. at 34, 55; Naider Aff. ¶ 23.)

Entering an URL into the browser can "trigger" the SaveNow software to deliver a "pop-up" advertisement.[18] (Tr. at 172.) When a user types a search word or URL into the Internet browser, the SaveNow software looks to see what category of products or services the address belongs to. (Tr. at 144.) In general, if the SaveNow user's Internet usage "matches" information contained in the SaveNow directory, the SaveNow software will determine that an ad should be shown, will retrieve a pop-up advertisement from a server over the Internet, and will display that pop-up ad in a new window appearing on the user's computer screen. (Tr. at 34, 141, 145; Naider Aff. ¶ 26.) More pertinent to this case, when a user types in "1800contacts.com," the URL for Plaintiff's website,

the SaveNow software recognizes that the user is interested in the eye-care category, and retrieves from an Internet server a pop-up advertisement from that category. (Tr. at 144–45.) Mr. Naider described the functioning of the proprietary directory contained in the SaveNow program:

> [E]ssentially, the program contains a directory of the Internet, and ... has over 40,000 elements in this directory. Elements such as URL's, but many other elements, such as search terms, something we call key-word algorithms. So an example of a key-word algorithm would be, the software processes the content of the page and if I'm reading an article where the word "diabetes" appears four times and the word "type I" or "type II" in conjunction with that, that would be an example of a key-word algorithm. All of those elements, the URL's, the search terms, the key-word algorithms, are processed and compared against this directory of 40,000, and growing, elements. And then a decision is made that says, OK, this user is engaged in activity in a particular category— again, it may be hotel travel or air travel, in this case contact lenses or eye care—and the ad units themselves are basically associated with categories, such that if the software detects, by looking at these elements, activity in a category, it may display an ad that's relevant to that category.

(Tr. at 65.)

Usually there is a "few-second" delay between the moment a user accesses a

---

produce a list of hundreds of web sites through which the user must sort in order to find what he or she is looking for. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202 F.3d 489, 493 (2d Cir.2000)

**17.** The directory is stored on the SaveNow user's computer as a part of the SaveNow application. (Naider Aff. ¶ 23.)

**18.** "Pop-up" windows are windows containing notifications or advertisements that appear on the screen, usually without any triggering action by the computer user.

website, and the point at which a SaveNow pop-up advertisement appears on the user's screen. (Tr. at 146.)

If a SaveNow user who has accessed the 1–800 Contacts website and has received a WhenU.com pop-up advertisement does not want to view the advertisement or the advertiser's website, the user can click on the visible portion of the window containing the 1–800 Contacts website, and the 1–800 Contacts website will move to the front of the screen display, with the pop-up ad moving behind the website window. (Tr. at 63–64.) Or, if the user recognizes that a different website has appeared on the screen, the user can close the pop-up website by clicking on its "x," or close, button. If the user clicks on the pop-up ad, the main browser window (containing the 1–800 Contacts website) will be navigated to the website of the advertiser that was featured inside the pop-up advertisement. (Tr. at 63.)

The contents of the SaveNow proprietary directory are automatically updated. (Tr. at 142.) When a SaveNow user connects to the Internet, the SaveNow software receives information and updates itself without any prompting or conscious choice by the user. (Tr. at 142–43.) The SaveNow software does not store any information about the individual computer user, or track the user's usage of the computer. (Tr. at 28.) Once installed, the SaveNow software requires no action by the user to activate its operations; instead, the SaveNow software responds to a user's "in-the-moment" activities by generating pop-up advertisement windows that are related to the content of the websites a user has accessed. (Tr. at 27–28.)

Computer users typically install the SaveNow software as part of a "bundle"[19] of other software applications that consumers download at no cost. (Tr. at 67, Naider Aff. ¶ 33). A user who installs a typical software "bundle" clicks through four screens,[20] (Tr. at 68), and to proceed with installing the software "bundle," is required to approve a license agreement with WhenU, by clicking "I Agree" on the installation window.[21] (Tr. at 68; Memo in Opposition at 10). There have been approximately 100 million downloads of the

19. E.g. if a user wants a free cartoon character screensaver, in order to get it the user has to accept also the other programs it is bundled with. The screensaver is the lure that hooks the user into downloading the bundled software.

20. As demonstrated at the hearing, the first screen encountered by a user installing a typical software bundle is a welcome screen, the second screen contains a license agreement for a screensaver software program (not related to WhenU.com's software), the third screen contains an opportunity to join an email list for the screensaver program, and the fourth screen describes where on the computer the software will be installed. (Tr. at 68.)

21. A "typical" SaveNow License Agreement states, in pertinent part:

> SaveNow shows users relevant contextual information and offers as they surf the Web. There are a vast number of offers and services available to Internet users that SaveNow may display. In addition, WhenU. com negotiates exclusive offers to maximize value for users. The software's goal is to show users information about these offers and services—right at the moment when they need it. Offers and information are provided to users by showing a limited number of relevant ads in the form of interstitials ("pop-up ads") and other ad formats. These offers and ads are shown when users visit various sites across the Internet, based on URLs visited by the user and/or search terms typed into search engines and/or the HTML content of the page viewed by the user. SaveNow ads/offers are delivered independently from the site the user happens to be visiting when they see a SaveNow ad/offer and are not endorsed or affiliated with anyone other than WhenU.com.

(Naider Aff. ¶ 23, Ex. G.)

SaveNow program. (Tr. at 166.) The Sa-veNow software can be uninstalled from a user's computer, and Mr. Naider testified that approximately 75 million people have uninstalled the program. (Tr. at 70–71.)

The SaveNow software generates at least three kinds of ads—an ad may be a small "pop-up" advertisement appearing in the bottom right-hand corner of a user's screen; it may be a "pop-under" advertisement that appears behind the webpage the user initially visited; or it may be a "pan-oramic" advertisement that stretches across the bottom of the user's computer screen. (Naider Aff. ¶ 41.)

Pop-up advertisement windows generated by the SaveNow software are "brand-ed"—a green "$" mark and the text "Save-Now!" are affixed to the top of the pop-up window. On the upper right-hand corner of the SaveNow ad windows, next to the "X" symbol that typically closes windows, is a "?" symbol that, when clicked, opens a new window containing a notice explaining the SaveNow software and a link to a page with more detailed information for remov-ing or "uninstalling" the software.[22] (Tr. at 56–61; Naider Aff. ¶ 42.) As of the filing of this lawsuit, the pop-up advertise-ment windows contained text, at the bot-tom right of the pop-up window, stating: "A WhenU offer—click? for info."[23] *Id.*

One of the elements contained in the SaveNow proprietary software directory is the URL, "1800Contacts.com," which is the Internet website address for Plaintiff 1–800 Contacts. (Tr. at 134.) Since at least the Summer of 2002, when computer users who had the SaveNow software in-stalled on their computers ("SaveNow users") accessed Plaintiff's website, pop-up or pop-under advertisements for Defen-dant Vision Direct would appear on the user's screen. (Pl. Oct. 9, 2002 at 8; Ma-thison Decl. at ¶ 14).

WhenU.com's clients "buy categories" of goods or services, paying for delivery of their advertisements or coupons to Sa-veNow users' screens when the SaveNow users are working in relevant categories. (Tr. at 65–66, 152.) Under some of WhenU.com's contracts, advertisers pay WhenU.com to deliver pop-up advertise-ments to SaveNow users' screens; under other contracts, advertisers pay WhenU. com based on the number of people who click on the pop-up advertisements; still other advertisers pay WhenU.com based on the number of actual purchases made by SaveNow users from pop-up ads that have been delivered to their computers. (Tr. at 152.) Thus, WhenU.com has a *fee* relationship with the advertisers who pay it to deliver pop-up advertisements, and a *free* relationship with consumers who

---

**22.** The notice says:

This offer is brought to you by WhenU.com, through the SaveNow service. SaveNow alerts you to offers and services at the mo-ment when they are most relevant to you. SaveNow does not collect any personal in-formation or browsing history from its users. Your privacy is 100 percent protect-ed. The offers shown to you by SaveNow are not affiliated with the site you are visit-ing. For more about SaveNow, click here or e-mail information at WhenU.com. At WhenU, we are committed to putting you in control of your Internet experience.

(Tr. at 58–59).

**23.** In December 2002, subsequent to the filing of this lawsuit, WhenU.com replaced this text with a new disclaimer, stating: "This is a WhenU offer and is not sponsored or dis-played by the websites you are visiting. *More* ..." If a user clicks on the *"More,"* a new window displays the same statement that was generated when the user clicked on the "?" character. (Tr. at 58.) However, since "there is no guarantee that Defendants will not simply return to the same conduct if the case is dismissed without issuance of an in-junction," the Court considers the disclaimers as they appeared at the time the action was filed. *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 186 n. 8 (W.D.N.Y.2000).

install the SaveNow software on their computers, but *no* relationship with the companies on whose websites the pop-up advertisements appear.

## C. Plaintiff's Theory of the Case

Plaintiff argues that it has been harmed by the creation of an "impermissible affiliation between Plaintiff and Defendant," since because of Defendants' pop-up advertising, users "are likely to have the impression that the pop-up advertisements operate in cooperation with, rather than in competition against, the Plaintiff." (Pl. Oct. 9, 2002 at 10–11). Plaintiff argues the "pop-up advertisements also interfere with and disrupt the carefully designed display of content" on Plaintiff's copyrighted website. (*Id.*) Plaintiff argues further that the pop-up advertising enables Defendants to "profit illegally from unauthorized pop-up advertisements delivered to Plaintiff's website," (*Id.* at 11), and that through the pop-up advertisements, "Defendants are free-riding on the name, reputation, and goodwill that Plaintiff has worked so hard to attain." (*Id.*) Plaintiff argues that, by causing pop-up advertisements to appear on the copyrighted 1–800 Contacts website, Defendants have altered the copyrighted website, and in so doing, have infringed Plaintiff's exclusive rights to display its copyrighted works and to prepare derivative works. (Tr. at 359.) Plaintiff also argues that Defendants' pop-up advertising has created a likelihood of confusion between Defendant Vision Direct and Plaintiff, and that since Plaintiff has a valid trademark, Defendants have infringed Plaintiff's trademark. (Tr. at 369–70.)

Plaintiff's expert, William D. Neal, conducted a consumer survey to determine whether Defendants' pop-up advertising scheme was likely to cause confusion as to the source of the pop-up advertisements. (Tr. at 209, 243; Neal Dec. ¶ 3.) Specifically, Mr. Neal's overall research goal was to "[d]etermine whether online shoppers who wear or expect to wear contact lenses in the future, and who have the SaveNow software from WhenU.com installed on their computers, are confused and/or misled as to the source of SaveNow generated pop-up advertisements." (Neal Dec., Ex. B.)

Mr. Neal began with an Internet panel [24] to gather potential respondents to his survey. (Tr. at 210, 215.) Mr. Neal testified that from the initial 3.5 million people in the Internet panel, he selected a sample of 100,000 people,[25] and invited them to take a survey, and that approximately 46,000 people responded to that invitation. (Tr.

---

**24.** In his "Description of Data Analyst Online Panel," Mr. Neal affirms that:

A sample of respondents was drawn from American Consumer Opinion™ Online, Decision Analyst, Inc.'s Internet panel of over 3,500,000 consumers. These respondents were screened, and qualified participants were invited to Decision Analyst's encrypted OpinionSurvey™ Internet server to complete the survey.

(Neal Aff., Ex. D.)

Mr. Neal notes that "[t]he maximum number of surveys completed per panel household is two surveys per month, although this maximum is rarely achieved. The average panel household participates in three or four studies per year." *Id.*

Mr. Neal also states that "Panels are recruited by a combination of online and offline methods (telephone, mail, banner advertising, print advertising, publicity). The recruiting is designed to make each panel as representative of its target population as possible. American Consumer Opinion™ Online is linked to over 1,000 other Internet sites to provide a steady stream of new panelists."

**25.** Mr. Neal drew a "nationally representative stratified quota sample" from the internet panel, "balanced by geography and demographics such as age and income." (Neal Dec., Ex. D.)

at 210.) Of this group, Mr. Neal determined that approximately 9.6% had the SaveNow software installed on their computers. (Tr. at 210.) Mr. Neal testified that his survey data was based on responses of 994 respondents, about half of whom were individuals who had the SaveNow software installed on their computers. (Tr. at 209.) The survey was administered online. (Neal Dec., Ex. B.)

From the survey, Mr. Neal concluded that 76% of survey respondents who had SaveNow software on their computer did not know that SaveNow software generates pop-up advertisements on their computer screens when they visited certain websites.[26] (Tr. at 211; Neal Dec. at ¶ 7c). Mr. Neal concluded that 60% of survey respondents who had experienced pop-up advertisements on their computer believe that "pop-up advertisements are placed on the website on which they appear by the owners of that site,"[27] and 52% believe that "pop-up advertisements have been pre-screened and approved by the website on which they appear."[28] (Tr. at 211; Neal Dec. at ¶ 7d). Mr. Neal also concluded that 51% of the survey respondents who had SaveNow software installed on their

computer had never heard of that software program,[29] and that 68% did not know it was installed on their computer prior to his research study.[30] (Tr. at 210, Neal Dec. at ¶ 7b).

Mr. Neal testified that "a specific trademark was not researched" in his survey. (Tr. at 249.) Mr. Neal testified he did not view a SaveNow pop-up advertisement prior to administering the survey, (Tr. at 258), and did not show survey respondents an example of a SaveNow pop-up advertisement. (Tr. at 264.) Mr. Neal's survey did not ask whether the respondent had ever seen a SaveNow pop-up ad, (Tr. at 265.), did not attempt to distinguish between SaveNow pop-up ads and other pop-up ads, (Tr. at 266–67), and did not determine whether differences between Save-Now ads and other pop-up ads might have affected users' perceptions of the advertisements provided by SaveNow. (Tr. at 268–69.) Mr. Neal testified that although he had not provided survey respondents with an example of a SaveNow pop-up advertisement, it was "very reasonable" to assume that SaveNow users would have seen SaveNow pop-up ads. (Tr. at 272.) Mr. Neal testified that the reason he did

26. In response to Question 9, "Were you aware that, when viewing websites on the Internet, SaveNow software causes 'Pop–Up' advertisements to be displayed on your computer which are not authorized by the website on which they appear?", 75.74% of those respondents who had SaveNow on their computers responded "No." (Neal Dec., Ex. E.)

27. In response to Question 4–1, "I believe that 'Pop–Up' advertisements are placed on the website on which they appear by the owners of the website", 59.98% of those respondents who had SaveNow on their computers responded "Agree," while 61.11% who did not have SaveNow on their computers responded "Agree." (Neal Dec., Ex. E.)

28. In response to Question 4–6, "I believe that 'Pop–Up' advertisements have been pre-screened and approved by the website on

which they appear", 52.04% of those respondents who had SaveNow on their computers responded "Agree," while 52.21% who did not have SaveNow on their computers responded "Agree." (Neal Dec., Ex. E.)

29. In response to Question 5, "Prior to your participation in this survey, had you ever heard of a free software program offered by WhenU.com called SaveNow?", 51.02% of those respondents who had SaveNow on their computers responded "No." (Neal Dec., Ex. E.)

30. In response to Question 6, "Prior to your participation in this survey, did you know that the SaveNow software from WhenU.com was installed on your computer?", 68.16% of those respondents who had SaveNow on their computers responded "No." (Neal Dec., Ex. E.)

not research a specific trademark was that he understood

> that there is a plethora of ads that can be demonstrated or generated through SaveNow, everything from contact lenses to indoor/outdoor carpet to almost anything else. To try to generate that plethora of ads in a research experiment would have been, one, very difficult. The other problem we have is how do you design a control for that? It's nearly impossible. My alternative position was to rely on people's recent recall of what they were seeing in terms of pop-up ads and ask them about their beliefs of those pop-up ads, who generated them, who authorized them, who was paying for them.

(Tr. at 272–73.)

## D. Defendant WhenU's Theory of the Case

According to Avi Naider, CEO of WhenU.com, the SaveNow software was conceived to "revolutionize marketing from implied interest, interests that are deducted [sic] based on who a consumer is and what their personal information is, to actual interests, when you shop, when you travel, when you invest. And that's why we named the company WhenU.com." (Tr. at 24.) Mr. Naider testified that the way the SaveNow software works is that

> the software runs in the background, and it doesn't require anything of the user. That's the point. *Meaning if the user actually has to go and start saying to the software, OK, fine, offers on travel, they can do that through a search engine.* This is a piece of software that is designed to remind the user, to push information to the user.

So the user is on the Internet, they're looking at, let's say, travel or any other type of activity. The software, in a separate window, will deliver, or it may deliver, an ad to them that's relevant based on their in-the-moment activity.

(Tr. at 27, emphasis added.)

Mr. Naider testified that the SaveNow program performs "contextual marketing," which Mr. Naider defined as "delivering something to a consumer when they need it." (Tr. at 29.) As an example of contextual marketing, Mr. Naider discussed a receipt he had received after completing a grocery-store purchase of, among other things, a lactose-free, non-dairy milk product. Printed at the bottom of the store receipt was a coupon for a lactose-free, non-milk product, which Mr. Naider testified he received because a marketing company had identified his potential preferences from his purchasing behavior. (Tr. at 31.)

Mr. Naider analogized the operation of the pop-up windows generated by the SaveNow software to the functioning of several other common software programs. Specifically, using images from computer screen captures, Mr. Naider demonstrated that, in Windows, it is possible to have multiple windows, containing unrelated program applications, running at the same time. (Tr. at 36.) Mr. Naider continued, by demonstrating that windows generated by a Windows "instant messaging" application [31] would pop up without warning while he was working in an unrelated spreadsheet program, in order to deliver messages sent over the Internet by friends. (Tr. at 37–38.) Mr. Naider also testified that on his home computer he received messages and alerts from programs,[32] that

---

**31.** The "instant messaging" windows demonstrated were generated by an America Online program; however Mr. Naider testified that other instant messaging applications behaved similarly. (Tr. at 42.)

**32.** Mr. Naider referred specifically to a video software, called "Realplayer," which he testified "every once in a while, something pops in front of my screen from them." (Tr. at 41.)

he had not triggered through any action of his own. (Tr. at 41.) Mr. Naider testified that, in general, computer users in the Windows operating environment expect to be working in multiple windows simultaneously, and that in "pushing" information to the user, the SaveNow software was acting much like other software applications that opened new "pop-up" windows. (Tr. at 41, 49–50.) Mr. Naider also testified that the pop-up windows had "no physical relationship with the main browser window," that the SaveNow software had "absolutely no knowledge" of where the main browser window was, and that the pop-up advertisements did not alter the main browser window in any way. (Tr. at 51.)

At the hearing, Professor John Deighton, an expert in interactive marketing, testified that as a result of the structure of the Internet, a new publishing and retailing model has developed. (Tr. at 85–94.) Professor Deighton said the economic investment required to publish on the Internet is much lower than in traditional publishing industries [33] and that, although 60 percent of the population of the United States is part of the Internet "audience," "no significant group of that audience is in any one place at any one time." (Tr. at 84–88.) As a result, Professor Deighton said that a new model has emerged, wherein publishing and retailing have "conjoined," and that individual websites are "a combination of publisher and marketplace," since it is expected that the websites will be read like a publication, but also an expectation that there will be competition, as in a marketplace. (Tr. at 88–90.) Professor Deighton said that the WhenU software is an example of a model for retailing and publishing that "will return to the Internet some of the cost that

was made to build the Internet." (Tr. at 89.)

Professor Deighton also testified that a preliminary injunction in this case would have "some short-term immediate impacts and some chilling long-term impacts." (Tr. at 98.) Specifically, Professor Deighton testified that consumers who had elected to use the WhenU.com software would be frustrated in their attempts to continue to use it, and that competition in the advertising sector might be chilled. (Tr. at 98–99.) Dr. Deighton testified further:

> The Internet is not a decade old and we have seen enormous fortunes made and lost. That process must be allowed to continue if the right model to support this wonderful institution is going to be discovered. I think that unnecessarily harsh restrictions on this initiative would discourage others from similar initiatives or improved initiatives.

(Tr. at 100.)

Defendants did not conduct their own survey to determine whether the SaveNow software caused consumer confusion. Instead, to challenge the validity of Mr. Neal's survey, Defendant WhenU.com produced Dr. Jacob Jacoby. Dr. Jacoby attacked Mr. Neal's research on a number of fronts.

Dr. Jacoby testified that because Mr. Neal failed to show any WhenU.com ads to survey respondents, survey respondents could not have had a "clear indication in their minds as to what [Mr. Neal] meant" when he defined pop-up ads. (Tr. at 290–91.)

Dr. Jacoby also testified that if Mr. Neal had intended to conduct a survey that revealed what respondents recalled about

---

**33.** Professor Deighton testified that "[c]reating a website is within the reach of a child."

(Tr. at 87.)

pop-up advertising, Mr. Neal should have asked the survey respondents what they recalled about advertising, instead of providing his own definition of pop-up advertisements, followed by questions about pop-up advertisements. (Tr. at 294.) Dr. Jacoby testified that he had "never seen recall used in assessing likelihood of confusion," (Tr. at 295.), and that use of recall threatened the validity of Mr. Neal's survey, since there was nothing to guarantee that pop-up advertisements the survey respondents had seen were generated by the SaveNow program. (Tr. at 296.) Dr. Jacoby testified that this was significant because pop-up advertisements vary in size, placement, and content. (Tr. at 297.) Dr. Jacoby testified that the recall problem could have been avoided by use of an example, in order to distinguish SaveNow advertisements from other pop-up advertisements. (Tr. at 298.) In sum, Dr. Jacoby testified that Mr. Neal's suggestion of a definition of pop-up advertisements was "a leading, loaded kind of language." (Tr. at 304.)

Dr. Jacoby further testified that Mr. Neal inappropriately colored the language of questions, by suggesting that pop-up advertisements appeared "on a website" instead of on the computer screen, and by telling the respondents that pop-up advertisements were not authorized by the websites on which they appeared. (Tr. at 306–09.)

Avi Naider, the president of WhenU.com, testified that a preliminary injunction would result in damage to his company in excess of $10,000,000 over twelve months. (Tr. at 34.) His estimate of this amount was based on current or future advertisers who would cancel their advertising orders in order to avoid negative publicity or possible litigation. (Tr. at 33, 165.)

In a declaration attached to Defendant Vision Direct's Memorandum of Law, Ian Mummery stated: [34]

> A preliminary injunction against Vision Direct would undoubtedly damage it, possibly irreparably. Vision Direct's reputation is unblemished and must remain so if Vision Direct is to continue its spectacular success. Customers will undoubtedly be hesitent [sic] to purchase contact lenses from a company that has been enjoined.

(Mummery Dec. ¶ 9).

In addition, Mr. Mummery's declaration stated that on September 17, 2002, three weeks before this action was filed, Defendant Vision Direct voluntarily instructed its co-defendant, WhenU.com, to cease placing "pop-up" ads on Plaintiff's website, and that Vision Direct has no intention of resuming use of the offending pop-up advertising. (Mummery Dec. ¶ 7, 8.) Mr. Mummery's declaration also stated that Defendant Vision Direct had sued its co-defendant WhenU.com and Coastal Contacts, an Internet replacement contact lens retailer who is not a party in this case, for conduct that is substantially the same as that for which Vision Direct is being sued in this case.[35] (Mummery Dec. ¶ 8.)

---

**34.** Mr. Mummery's declaration was attached to Vision Direct's opposition to Plaintiff's motion. However, although Mr. Mummery makes his declarations upon personal knowledge, (Mummery Dec. ¶ 1), he does not identify what position he holds at Vision Direct. Mr. Mummery was not called to testify at the Preliminary Injunction hearing.

**35.** On December 11, 2002, Defendant Vision Direct filed a separate action, *Vision Direct v. WhenU.Com and Coastal Contacts, Inc.*, 02–

Civ–9788 (DAB), against WhenU.com, its co-defendant in this case, and against Coastal Contacts, a Canadian corporation that is not a party in this case. With the complaint in 02–Civ–9788, Vision Direct also filed an application for an *ex parte* Temporary Restraining Order. The Court held a conference call with counsel for all parties to both cases on December 16, 2002. Based on that call, on December 18, 2002 the Court denied Vision Direct's application for a Temporary Restraining Order, and denied the parties' re-

## II. DISCUSSION

### A. Standard for Preliminary Injunction

■ It is well-settled in this Circuit that "a party seeking a preliminary injunction must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief." [36] *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000); *Procter & Gamble Co. v. Cheseb-rough–Pond's, Inc.*, 747 F.2d 114, 118 (2d Cir.1984); *Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314–15 (2d Cir. 1982); *United States v. Siemens Corp.*, 621 F.2d 499, 505 (2d Cir.1980).

### B. Copyright Claims

■ To establish a *prima facie* case of copyright infringement, a Plaintiff must show "1) Ownership of valid copyright, and 2) Copying of constituent elements of the work that are original." *Feist Publications Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 158–59 (2d Cir.2001) (finding on the basis of this standard that "the owner of a copyright is thus entitled to prevail in a claim for declaratory judgment of in-

fringement without showing entitlement to monetary relief").

■ Plaintiff has filed as an exhibit to its Complaint a certificate of registration with the United States Copyright Office of the "1800 Contacts Web site," (Memorandum in Support at 4; Complaint Exh. D); this serves as *prima facie* evidence of valid ownership of a copyright. 17 U.S.C. § 410(c). This protection extends to both the computer code for the website and the screen displays of the website. *OP Solutions, Inc. v. Intellectual Property Network Ltd.*, 1999 WL 47191 at *10 (S.D.N.Y. 1999), 1999 U.S. Dist. LEXIS 16639, at *10 (noting that the protection accorded "non-literal" elements of a computer program extends to screen displays); *Harbor Software, Inc. v. Applied Systems, Inc.*, 925 F.Supp. 1042, 1045 (S.D.N.Y.1996) (finding sufficient expressive choices in the selection and arrangement of information compiled in screen reports and displays to satisfy the minimal requirement of originality to warrant protection).

Plaintiff alleges that Defendants have "copied" constituent elements of Plaintiff's website in the "broad sense of invasion of one of the exclusive rights secured to copyright owners under the Copyright Act." (Pl. Oct. 9, 2002 at 28) (quoting *Dynamic Solutions, Inc. v. Planning & Control, Inc.*, 646 F.Supp. 1329, 1337 n. 12 (S.D.N.Y.1986)). Plaintiff argues that the 1–800 Contacts website, as perceived by a SaveNow user,[37] appears differently than

quests for full discovery in this case until the disposition of the Preliminary Injunction motion.

**36.** Citing *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985), Plaintiff argues that, to show a likelihood of success on the merits, a party moving for a preliminary injunction "need not show that success is an absolute certainty," but that instead a movant need only show that the probability of success is "better than 50%" despite the fact that "considerable room for doubt" may remain about the ultimate case outcome. (Memoran-

dum in Support at 12). Plaintiff misstates the relevant standard, since the Second Circuit specifically noted in *Abdul Wali* that where, as here, a grant of preliminary injunctive relief would do more than merely maintain the status quo, the movant "must show a substantial likelihood of success on the merits, i.e., that their cause is considerably more likely to succeed than fail." 754 F.2d 1015, 1026 *overruled on other grounds*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

**37.** Plaintiff argues that, under *New York Times Co. v. Tasini*, 533 U.S. 483, 121 S.Ct.

the copyrighted website, and that the website's appearance has therefore been "modified and that Defendants' pop-up scheme caused this modification." (Pl. February 28, 2003 at 7). Specifically, Plaintiff alleges that Defendants have invaded Plaintiff's exclusive right to display the 1–800 Contacts website, in violation of 17 U.S.C. § 106(1), and its exclusive right to prepare derivative works based on the 1–800 Contacts website, secured to Plaintiff under 17 U.S.C. § 106(2).

### 1. Display Right, 17 U.S.C. § 106(1)

■ Plaintiff alleges that Defendants have invaded Plaintiff's exclusive right to display the 1–800 Contacts website. 17 U.S.C. § 106(1). Plaintiff argues it gives computer users a license to "use and display" its website, but does not give them a license to alter the website or change its appearance in any way. Plaintiff argues that, by delivering pop-up advertisements to a SaveNow user's computer while the user views Plaintiff's website, Defendants create a new screen display that incorporates Plaintiff's copyrighted work, thereby infringing Plaintiff's exclusive right to display its copyrighted work. (Memorandum in Support at 29).

For this Court to hold that computer users are limited in their use of Plaintiff's website to viewing the website without any obstructing windows or programs would be to subject countless computer users and software developers to liability for copyright infringement and contributory copyright infringement, since the modern computer environment in which Plaintiff's website exists allows users to obscure, cover, and change the appearance of browser windows containing Plaintiff's website.

Without authority or evidence for the claim that users exceed their license to view the copyrighted 1–800 Contacts website when they obscure the website with other browser windows (including pop-up ads generated by the SaveNow program), Plaintiff has little basis for its claim that Defendants have infringed its display right.

### 2. Derivative Works Right, 17 U.S.C. § 106(2)

■ Plaintiff also alleges that Defendants have invaded Plaintiff's exclusive right to prepare derivative works based on the 1–800 Contacts website, secured to Plaintiff under 17 U.S.C. § 106(2).

Section 106 of the Copyright Act provides that "the owner of copyright under this title has the exclusive right to ... prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106. However, Plaintiff has failed to show that

2381, 150 L.Ed.2d 500 (2001), "this Court must view Plaintiff's website as would a PC user surfing the web in order to determine whether Defendant modified Plaintiff's copyrighted works." Plaintiff appears to read *Tasini* too broadly. (Pl. Feb. 28, 2003 at 7). In *Tasini*, the Supreme Court held that the privilege accorded a newspaper, as a collective work copyright owner under § 201(c) of the Copyright Act, to reproduce and distribute parts of a collective work did not shield the newspaper from liability for permitting electronic publishers to include the work of individual authors in electronic online Databases. *Tasini*, 533 U.S. at 500, 121 S.Ct. 2381. The Court explained that "[i]n determining wheth-

er the Articles have been reproduced and distributed 'as part of' a 'revision' of the collective works in issue, we focus on the Articles as presented to, and perceptible by, the user of the Databases." *Tasini*, 533 U.S. at 499–500, 121 S.Ct. 2381. Although the *Tasini* Court turned to the perceptions of the computer user to determine whether articles had been reproduced and distributed "as part of" a "revision" of collective works for purposes of § 201(c), *Tasini* does not require this Court to "view Plaintiff's website as would a PC user surfing the web in order to determine whether Defendant modified Plaintiff's copyrighted works" in preparing a derivative work in violation of 17 U.S.C. § 106(2).

Defendants have created a "derivative work" that infringes Plaintiff's exclusive rights under § 106(2).

Plaintiff argues that, by delivering pop-up advertisements to a SaveNow user's computer while the user views Plaintiff's website, Defendants are adding a Vision Direct advertisement to Plaintiff's copyrighted screen display, thus creating a derivative of the Plaintiff's copyrighted screen display, and in the process violating "two fundamental tenets of copyright law—exceeding the license granted and destroying the author's control over the manner in which its work is presented." (Pl. Oct. 9, 2002 at 30).

For the reason set forth above, to the extent Plaintiff's derivative work argument relies on a theory that Defendants cause or contribute to copyright infringement by a SaveNow user when viewing Plaintiff's copyrighted screen display, in excess of the license granted by Plaintiff,[38] this argument fails.

■ Plaintiff's second theory is that Defendants have created a derivative work by adding to or deleting from Plaintiff's copyrighted website, and therefore have transformed or recast the website, in derogation of Plaintiff's exclusive derivative work right. (Pl. Oct. 9, 2002 at 29.) Plaintiff argues that to infringe their derivative work right, Defendants need not have made a copy of the original work in order to create a derivative work,[39] and that to violate its protected right to prepare derivative works, Defendants "need only transform or recast the copyrighted work in some way," as by "adding to or deleting from" Plaintiff's copyrighted website. (Pl. Oct. 9, 2002 at 29.) Plaintiff analogizes the

pop-up ads in this case to advertisements added to and interspersed throughout the text of a copyrighted book in *National Bank of Commerce v. Shaklee Corp.*, 503 F.Supp. 533 (W.D.Tex.1980), which were found to be "unauthorized additions" to the book text, in violation of the book author's copyright. (Pl. Oct. 9, 2002 at 30). Plaintiff's argument fails because Defendants have not created a "derivative work."

In order for Plaintiff's derivative work right to have been infringed, the Court must find that the screen display of the 1–800 Contacts website, with Defendant's pop-up ads, is in fact a "derivative work," as defined at 17 U.S.C. § 101.

A "derivative work" is:

> ... a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, *represent an original work of authorship*, is a 'derivative work'.

17 U.S.C. § 101 (emphasis added).

In general, copyright protection is limited to protection of

> ... original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, ei-

---

**38.** Memorandum in Support, at 28 (citing *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 693 (2d Cir.1998)).

**39.** Plaintiff cites *Aymes v. Bonelli*, 47 F.3d 23, 25 (2d Cir.1995) as support for this prop-

osition. However, in *Aymes* the defendant conceded that it had altered the computer program at issue and thereby created a "derivative work." *Aymes*, 47 F.3d at 25.

ther directly or with the aid of a machine or device.

17 U.S.C. § 102.

A work is "fixed" in a tangible medium of expression:

> ... when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

17 U.S.C. § 101.

Applying the "fixation" requirement here, Plaintiff has failed to show that its website, and Defendants' pop-up advertisements are "sufficiently permanent or stable to permit it to be perceived, reproduced or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. Indeed, Defendants' pop-up ad windows may be moved, obscured, or "closed" entirely—thus completely disappearing from perception, with a single click of a mouse. (Tr. at 63–64.) Moreover, to the extent pop-up advertisements fit the description of "transmitted images," they are not "fixed" works, since there is no evidence that a fixation is made "simultaneously with" the pop-up advertisements' "transmission" to the viewer of the website.[40] 17 U.S.C. § 101.

Given that the screen display of the 1–800 Contacts website with Defendant's pop-up ads is not "fixed in any medium," it

is not sufficiently "original" to qualify as a derivative work under the second sentence of 17 U.S.C. § 101.

The first sentence of 17 U.S.C. § 101 also allows "non-original" works to qualify for "derivative" work status. Since the screen display of the 1–800 Contacts website with Defendant's pop-up ads is not a "translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation," for Plaintiff's to prevail, it must show that Defendants have "recast, transformed, or adapted" the 1–800 Contacts website. None of these three actions seems to describe what is done to Plaintiff's website by Defendants' pop-up ads, since Plaintiff's website remains "intact" on the computer screen. Defendants' pop-up ads may "obscure" or "cover" a portion of Plaintiff's website—but they do not "change" the website, and accordingly do not "recast, transform or adapt" the website. *Lee v. A.R.T. Company*, 125 F.3d 580, 582 (7th Cir.1997) (mounting plaintiff's art works on ceramic tiles did not create "derivative work," and therefore did not infringe plaintiff's copyright). Moreover, if obscuring a browser window containing a copyrighted website with another computer window produces a "derivative work," then *any* action by a computer user that produced a computer window or visual graphic that altered the screen appearance of Plaintiff's website, however slight, would require Plaintiff's permission. A definition of "derivative work" that sweeps within the scope of the copyright law a multi-tasking Internet shopper whose word-processing program

---

**40.** The lack of any "fixation" here explains why Plaintiff errs in its assertion that this case is analogous to *National Bank of Commerce v. Shaklee Corp.,* 503 F.Supp. 533 (W.D.Tex. 1980). While in this case any "derivative" work created when a computer user views Plaintiff's copyrighted website as modified by Defendants' pop-up advertisements is not fixed in any tangible medium of expression, the books published with unauthorized interspersed advertisements in *National Bank of Commerce v. Shaklee Corp.,* were clearly "fixed" in print.

obscures the screen display of Plaintiff's website is indeed "jarring," and not supported by the definition set forth at 17 U.S.C. § 101. *See id.*

Since Plaintiff has failed to demonstrate that Defendants have invaded the exclusive rights secured to Plaintiff under the Copyright Act, there is little likelihood that Plaintiff will succeed on the merits of its copyright claims. *Dynamic Solutions, Inc. v. Planning Control, Inc.*, 646 F.Supp. 1329, 1337 n. 12 (S.D.N.Y.1986). In view of this finding, there is no need to address the question of irreparable injury on these grounds.

Accordingly, Plaintiff's motion for a preliminary injunction based on the Defendants' alleged infringement of Plaintiff's copyrights is DENIED.

## C. Trademark Infringement

■ The Lanham Act prohibits the use in commerce, without consent, of any "registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods," in a way that is likely to cause confusion. 15 U.S.C. § 1114(1)(a). The act also prohibits the infringement of any unregistered, common law trademark. 15 U.S.C. § 1125(a)(1); *Time, Inc. v. Petersen Publishing Co.*, 173 F.3d 113, 117 (2d Cir.1999); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997). Under 15 U.S.C. § 1125(a)(1), the plaintiff has the burden of proving:

a) ownership of a valid mark that is entitled to protection under the Lanham Act;

b) Defendant's use of the mark is likely to cause confusion within the consuming public.[41]

■ In a trademark infringement case, "a showing of likelihood of confusion estab-

lishes both a likelihood of success on the merits and irreparable harm ... assuming that the plaintiff has a protectible mark." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988) (citations omitted).

### 1. "Use" under the Lanham Act

Defendant WhenU.com argues it is not using Plaintiff's mark for purposes of the Lanham Act. Defendant notes that, as a result of features of the Windows operating environment that allow users to open multiple windows at one time, Defendant WhenU's SaveNow program generates new windows, displayed simultaneously with other pages. (Naider Aff. ¶ 40–42; WhenU.com Jan. 31, 2003 at 15–16). As a result, windows generated by SaveNow may be visible at the same time as a window containing Plaintiff's website, but WhenU.com argues this is not "use" within the Lanham Act. Defendant WhenU.com argues that "[n]othing is more fundamental than that a plaintiff cannot prevail on a claim for trademark infringement, pursuant to Section 1114 of the Lanham Act, or unfair competition, pursuant to Section 1125(a) of the Lanham Act, unless it can show that the defendant is *using* one of its marks in commerce in a way that is likely to cause confusion." (WhenU.com Jan. 31, 2003 at 17–18.)

A trademark is "used in commerce" for purposes of the Lanham Act "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services." 15 U.S.C. § 1127.

---

**41.** *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir.1995) (internal citations omitted); *Estee Lauder, Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1508 (2d Cir.1997).

■ ■ Defendants here use Plaintiff's mark in two ways. First, in causing pop-up advertisements for Defendant Vision Direct to appear when SaveNow users have specifically attempted to access Plaintiff's website—on which Plaintiff's trademark appears—Defendants are displaying Plaintiff's mark "in the . . . advertising of" Defendant Vision Direct's services. Both Defendant Vision Direct and Plaintiff 1–800 Contacts are retail providers of replacement contact lenses, and therefore are unquestionably providing services "rendered in commerce." SaveNow users that type Plaintiff's website address into their browsers are clearly attempting to access Plaintiff's website because of prior knowledge of the website, knowledge that is dependent on Plaintiff's reputation and goodwill. SaveNow users that type Plaintiff's trademark "1–800 Contacts" into a search engine in an attempt to find the URL for Plaintiff's website are exhibiting a similar knowledge of Plaintiff's goods and services, and pop-up advertisements that capitalize on this are clearly using Plaintiff's mark. Thus, by causing pop-up advertisements to appear when SaveNow users have specifically attempted to find or access Plaintiff's website, Defendants are "using" Plaintiff's marks that appear on Plaintiff's website. 15 U.S.C. § 1127.

Second, Defendant WhenU.com includes Plaintiff's URL, <www.1800contacts.com>, in the proprietary WhenU.com directory of terms that triggers pop-up advertisements on SaveNow users' computers. (Tr. at 134.) In so doing, Defendant WhenU.com "uses" Plaintiff's mark, by including a version of Plaintiff's 1–800 CONTACTS mark, to advertise and publicize companies that are in direct competition with Plaintiff.

Accordingly, the Court finds that Defendants have "used" Plaintiff's mark in commerce. *OBH, Inc. v. Spotlight Magazine, Inc.,* 86 F.Supp.2d 176, 185–86 (W.D.N.Y. 2000) (finding defendants to have "used in commerce" plaintiffs' mark where defendants: 1. used plaintiffs' trademark as the domain name for defendants' web site—which contained a link to defendants' other web site that was operated for commercial purposes; 2. used plaintiffs' trademark on the Internet, an international network; and 3. affected plaintiffs' ability to offer their services in commerce); *Planned Parenthood Fed'n of Am., Inc. v. Bucci,* 1997 WL 133313, at *3 (S.D.N.Y. Mar.24, 1997), *aff'd,* 152 F.3d 920 (2d Cir.1998), *cert. denied,* 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998).

Defendant errs in construing use "in connection with the services" to require "use as a trademark to identify or distinguish products or services." In support of its too narrow reading of the definition of "use," Defendant cites *Lone Star Steakhouse v. Longhorn Steaks,* 106 F.3d 355, 361 (11th Cir.1997). In *Lone Star,* the 11th Circuit upheld the district court's denial of the plaintiff restaurant owner's motion for a preliminary injunction, because plaintiffs had not "used" the service mark at issue prior to the defendant's registration of a similar mark. The court held that, as a matter of law, use of the mark "on a sign displayed on an interior wall of Plaintiff's . . . [r]estaurant . . . did not constitute a valid service mark use because it was not being used to identify or distinguish the services being offered." 106 F.3d at 361. The facts here are not controlled by the *Lone Star* court's reasoning. First, the question here is not whether Plaintiff adequately used its mark to establish a valid service mark; the question is whether *Defendant* is "using" Plaintiff's trademark. Second, even if this Court were to find that the standard for "use" required to establish a valid service mark is the same as the standard for "use" in the infringement context, in any case WhenU's use exceeds that of the plaintiff in *Lone Star.* Here,

WhenU.com is doing far more than merely "displaying" Plaintiff's mark. WhenU's advertisements are delivered to a Save-Now user when the user directly accesses Plaintiff's website—thus allowing Defendant Vision Direct to profit from the goodwill and reputation in Plaintiff's website that led the user to access Plaintiff's website in the first place.

Defendant WhenU.com also cites *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 623–25 (6th Cir.1996), wherein the Sixth Circuit reversed the district court, which had found that the defendant—who used a 1–800 telephone number that differed from plaintiff's 1–800 HOLIDAY telephone number in the use of a "zero" instead of the "o"—had "used" plaintiff's mark because there was a "clear violation of the spirit, if not the letter, of the Lanham Act." The Sixth Circuit, noting that § 32 of the Lanham Act forbids the *"use* in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark ... which ... is likely *to cause* confusion," reversed because the defendants did not actually "use" the plaintiff's mark, since plaintiff's number was 1–800 HOLIDAY,[42] and defendants were using 1–800 409–4329, and also because the defendants "did not create any confusion," since the district court found that the defendants had "never advertised or publicized anything to do with Holiday Inns or its telephone number." *Holiday Inns, Inc.*, 86 F.3d at 623–25 (emphasis in original). Again, this case does not support Defendant WhenU.com's claim that it has not "used" Plaintiff's website within the meaning of the Lanham Act.[43]

### b.  Confusion Under the Lanham Act

Confusion for purposes of the Lanham Act is shown where there is a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question" or where "consumers are likely to believe that the challenged use of a trademark is somehow sponsored, endorsed, or authorized by its owner." *New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F.3d 550 (2d Cir.2002) (internal citations and quotations omitted). Thus, "[c]onfusion" for purposes of the Lanham Act includes confusion "of any kind, including confusion as to source, sponsorship, affiliation, connection or identification." *Guinness United Distillers & Vintners v. Anheuser-Bush*, 2002 WL 1543817, *2 (S.D.N.Y.2002); *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d 410, 413–14 (S.D.N.Y.2002).

Under the Lanham Act, actionable "confusion" may take a number of forms. In some cases, there may be actual confusion among members of the consuming public, and the plaintiff may be able to demonstrate—even at the preliminary injunction stage of the case—such actual confusion. *E.g., Register.Com, Inc. v. Domain Registry of America, Inc.*, 2002 WL 31894625, *11 (S.D.N.Y.2002); *Les Ballets Trockadero de Monte Carlo, Inc. v. Trevino*, 945 F.Supp. 563 (S.D.N.Y.1996) (confusion

---

42.  On a telephone keypad, 1–800 HOLIDAY translates numerically as 1–800 469–4329.

43.  While this case was *sub judice*, Defendants called to the Court's attention two decisions denying a preliminary injunction, by finding that "use" did not occur. In *Wells Fargo & Co. v. WhenU.com*, 293 F.Supp.2d 734, 763 (E.D.Mich.2003), the court determined that inclusion in SaveNow's proprietary directory of the Plaintiff's trademark was not "use," based on its reading of Sixth Circuit case law. In *U–Haul Intern., Inc. v. WhenU.com, Inc.*, 279 F.Supp.2d 723, 728 (E.D.Va.2003), the court made a similar ruling based on a factual finding that WhenU.com uses the marks for a "pure machine-linking function." This Court disagrees with, and is not bound by these findings.

among consumers, plaintiff's employees, and defendant's friends sufficient to show actual confusion).

■ However, a plaintiff may be unable to prove actual confusion in the market—in some cases because the market for a particular mark or product has not yet developed, or because the plaintiff has acted early enough to prevent actual confusion from developing. Thus, although in order to support a claim of infringement a plaintiff must show a probability, not just a possibility, of confusion, *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir.1998), a likelihood of confusion is actionable even absent evidence of actual confusion. *E.g., Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir.1988) (finding likelihood of confusion despite lack of evidence of actual confusion); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987) (finding lack of actual confusion did not undermine district court finding of likelihood of confusion), *overruled on other grounds*, 973 F.2d 1033, 1043–44 (2d Cir. 1992); *Lexington Management Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 286 (S.D.N.Y.1998) (lack of evidence of actual confusion neither supported nor detracted from plaintiff's motion for preliminary injunction); *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 555 (S.D.N.Y.1996).

■ Confusion need not be limited to the "point of sale" to be actionable under the Lanham Act. The Second Circuit has held that confusion among non-purchasers, arising from use of a mark outside of a retail environment after any sale or purchase of a product has concluded, is actionable under the Lanham Act.[44] *Clinique Laboratories, Inc.*, 945 F.Supp. at 558 (S.D.N.Y.1996) (use of disclaimers insufficient to address post-sale confusion among consumers).

■ Confusion that occurs prior to a sale may also be actionable under the Lanham Act. One such type of actionable pre-sale confusion, "initial interest confusion," occurs when a consumer, seeking a particular trademark holder's product, is instead lured away to the product of a competitor because of the competitor's use of a similar mark, even though the consumer is not actually confused about the source of the products or services at the time of actual purchase. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987).

Although the term "initial interest confusion" was coined in a Ninth Circuit case, *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir.1999), the principle that such confusion is actionable as grounds for a trade-

44. In *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F.Supp. 735 (S.D.N.Y. 1985), the plaintiff sought a declaration that the pattern of stitching on the back pockets of its jeans, which was virtually identical to the trademarked stitch pattern on the back pocket of the declaratory defendant's jeans—"two curved arches intercepting at midpoint"—did not infringe defendant's trademark. *Id.* at 737–39.

The district court held that, even if there were little likelihood of point-of-sale confusion among consumers, there was a "substantial likelihood of confusion among prospective purchasers viewing the marks in a post-sale

context," and accordingly granted summary judgment for defendants. *Id.* at 747–48.

On appeal, the Second Circuit reaffirmed that harm to a trademark owner—resulting from the likelihood that misuse of a mark might attract potential consumers to the junior user's product "based on the reputation built up by [the trademark owner]"—was actionable under the Lanham Act, and that "the Lanham Act was designed to prevent a competitor from such a bootstrapping of a trademark owner's goodwill ..." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986).

mark infringement action originated in this Circuit. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir.1987); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway and Sons*, 523 F.2d 1331, 1342 (2d Cir.1975) (finding harm to the defendant in the likelihood that a consumer, upon hearing plaintiff's name and thinking it had some connection with defendant's name, would consider plaintiff's product on that basis, since plaintiff's name would attract potential customers based on the reputation built up by the defendant for many years); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986) (acknowledging that the likelihood of confusion among potential customers is actionable harm under the Lanham Act); *Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506, 514–15 (S.D.N.Y.1993) ("Types of confusion that constitute trademark infringement include where ... potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase".)

In *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 229 U.S.P.Q. 890, 1986 WL 83765 (S.D.N.Y.1986), the district court found that plaintiff oil company would be harmed by "the likelihood that potential purchasers will think that there is some connection or nexus between the products and business of [defendant] and that of [plaintiff]." 229 U.S.P.Q. at 894, 1986 WL 83765. On appeal, the Second Circuit upheld the district court's finding, noting specifically that the district judge had

found a likelihood of confusion not in the fact that a third party would do business with Pegasus Petroleum believing it related to Mobil, but rather in the likelihood that Pegasus Petroleum would gain crucial credibility during the initial phases of a deal. For example, an oil trader might listen to a cold phone call from Pegasus Petroleum—an admittedly oft used procedure in the oil trading business—when otherwise he might not, because of the possibility that Pegasus Petroleum is related to Mobil.

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987).

Application of this principle to the Internet context was recognized in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999), in which the Ninth Circuit held that the Lanham Act bars a website owner from including in its HTML code any term that is confusingly similar to a competitor's mark. In *Brookfield*, the court found that the defendant's use of terms confusingly similar to plaintiff's trademarked term "MovieBuff" in metatags [45] placed in defendant's website would result in initial interest confusion "in the sense that, by using 'moviebuff.com' or 'MovieBuff' to divert people looking for 'MovieBuff' to its website, [defendant] improperly benefits from the goodwill that [plaintiff] developed in its mark." *Brookfield*, 174 F.3d at 1062. The court held that the resulting likelihood of initial interest confusion was actionable under the Lanham Act.[46] *Brookfield*, 174 F.3d at 1063.

---

45. A metatag is "buried code" that is not visible to Internet users, which is referenced by domain name search engines or directories to determine whether a website corresponds to descriptive keywords entered into the search engine by a computer user. Those websites with metatags corresponding to the requested keywords appear on the computer screen as the search engine's response. *Brookfield*, 174 F.3d at 1061–62 n. 23.

46. The facts of the case required the 9th Circuit to clarify whether use of a competitor's mark in a website's "metatags" infringed the competitor's rights under the Lanham Act. The Ninth Circuit defined "metatags" as

District courts in this circuit have noted that, on the Internet, initial interest confusion occurs when "potential consumers of one website will be diverted and distracted to a competing website." *Bihari v. Gross* 119 F.Supp.2d 309, 319 (S.D.N.Y.2000) ("In the cyberspace context, the concern is that potential customers of one website will be diverted and distracted to a competing website. The harm is that the potential customer believes that the competing website is associated with the website the customer was originally searching for and will not resume searching for the original website."); *BigStar Entertainment, Inc. v. Next Big Star, Inc.*, 105 F.Supp.2d 185, 207 (S.D.N.Y.2000) ("The concern is that many of those initially interested potential customers of plaintiff's would be diverted and distracted by defendants' site and would either believe that defendants' site is associated with plaintiff's or would not return to plaintiff's domain."); *Planned Parenthood*, 1997 WL 133313, at \*12 (Defendant's use of a domain name and home page address similar to plaintiff's mark "on their face, causes confusion among Internet users and may cause Internet users who seek plaintiff's web site to expend time and energy accessing defendant's web site."); *New York State Soc. of Certified Public Accountants v. Eric Louis Assoc., Inc.*, 79 F.Supp.2d 331, 342 (S.D.N.Y.1999) (Use by defendant of a domain name and metatag similar to plaintiff's common law service mark "caused a likelihood of confusion because it created initial interest confusion.").

As part of its argument that Defendants' pop-up advertising results in a likelihood of confusion, Plaintiff argues it has been injured by "initial interest confusion." (Pl. Oct. 19, 2002 at 20–21). Defendant WhenU.com devotes only a footnote to its

argument that Plaintiff cannot show initial interest confusion "because consumers are not drawn to another online location without knowing where they are being taken." (Memorandum in Opposition at 24 n. 14 (citing *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F.Supp.2d 185, 207–208 (S.D.N.Y.2000))). Defendant apparently misunderstands both the doctrine of initial interest confusion and the context of its quote from *BigStar*. The harm to Plaintiff from initial interest confusion lies not in the loss of Internet users who are unknowingly whisked away from Plaintiff's website; instead, harm to the Plaintiff from initial interest confusion lies in the possibility that, through the use of pop-up advertisements Defendant Vision Direct "would gain crucial credibility during the initial phases of a deal." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d at 259. *BigStar* in no way requires that a consumer be unaware that he or she is being drawn to another online location:

> Even if the customer quickly becomes aware of the competing source's actual identity and can rectify the mistake, the damage to the first user that the courts have identified manifest in three ways: the original diversion of the prospective customers' interest; the potential consequent effect of that diversion on the customer's ultimate decision whether or not to purchase caused by an erroneous impression that two sources of a product may be associated; and the initial credibility which may be accorded by the interested buyer to the junior user's products—customer consideration that otherwise may be unwarranted and that may be built on the strength of the senior user's mark, reputation and goodwill.

"HTML code not visible to Web users but used by search engines in determining which sites correspond to the keywords entered by a

Web user." *Brookfield Communications, Inc.*, 174 F.3d at 1061 n. 23.

*BigStar Entertainment, Inc. v. Next Big Star, Inc.,* 105 F.Supp.2d 185, 207 (S.D.N.Y.2000)

The Court finds that the principle of initial interest confusion is applicable in the specific context of Internet sales, and applies the *Polaroid* factors [47] "with an eye to how they bear on the likelihood that" [48] Defendants' pop-up advertisements will confuse consumers into thinking that Defendants are somehow associated with Plaintiff or that Plaintiff has consented to their use of the pop-up advertisements. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir. 1986).

### 3. Likelihood of Confusion

■■■ Traditionally, whether a mark is likely to cause confusion is determined by the familiar eight-factor test set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Under the *Polaroid* test, courts assess [49] the likelihood of consumer confusion by examining:

1) the strength of Plaintiff's Mark;

2) the similarity between the plaintiff's and defendant's marks;

3) proximity of the parties' services;

4) the likelihood that one party will "bridge the gap" into the other's product line;

5) the existence of actual confusion between the marks;

6) the good faith of the Defendant in using the mark;

7) the quality of the Defendant's services;

8) the sophistication of the consumers.

*Polaroid,* 287 F.2d at 495.

However, while a trial court considering the likelihood of confusion must evaluate the *Polaroid* factors,[50] the Second Circuit has cautioned that the *Polaroid* factors are not always dispositive. *Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739 (2d Cir.1998); *Estee Lauder Inc. v. The Gap. Inc.,* 108 F.3d 1503 (2d Cir.1997). Moreover, courts may consider other variables in evaluating the likelihood of confusion, and irrelevant factors may be abandoned. *See Gruner + Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1077 (2d Cir.1993). The unique facts of each case must be considered in evaluating the likelihood of confusion. *W.W.W. Pharm. Co., Inc. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993); *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 214 (2d Cir.1985)

---

**47.** *See Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

**48.** In *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir. 1986), the Second Circuit stated

the *Polaroid* factors must be applied in the instant case with an eye to how they bear on the likelihood that the appellants' use of appellee's trademark stitching pattern will confuse consumers into thinking that appellee is somehow associated with appellants or has consented to their use of the stitching pattern regardless of labeling.

**49.** "The ultimate conclusion as to whether a likelihood of confusion exists is not to be determined in accordance with some rigid

formula. The *Polaroid* factors serve as a useful guide through a difficult quagmire. Each case, however, presents its own peculiar circumstances." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986).

**50.** "The steady application of *Polaroid* is critical to the proper development of trademark law, for it is only when the *Polaroid* factors are applied consistently and clearly over time that the relevant distinctions between different factual configurations can emerge." *New Kayak Pool Corp. v. R & P Pools, Inc.,* 246 F.3d 183 (2d Cir.2001) (remanding for consideration of the *Polaroid* factors).

("[T]he complexities attendant to an accurate assessment of likelihood of confusion require that the entire panoply of elements constituting the relevant factual landscape be comprehensively examined. No single *Polaroid* factor is pre-eminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit.")

### a. Strength of Plaintiff's Mark

In *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993) *limited on other grounds, Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 46 (2d Cir.1994), the Second Circuit set forth the test for the strength of a mark:

> The focus under this factor is on the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source. Turning on its "origin-indicating" quality in the eyes of the purchasing public, a mark's strength is assessed using two factors: (1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace.

> To gauge the inherent distinctiveness of a mark, courts have used four categories: generic, descriptive, suggestive, and arbitrary or fanciful. A generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of goods ... Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and with ease of establishing infringement.

984 F.2d at 572 (internal citations and quotations omitted).

■ Because Plaintiff's mark, 1–800 Contacts, "is not a common description of goods," the Court finds Plaintiff's mark is not generic. *Cline v. 1–888–PLUMBING Group, Inc.*, 146 F.Supp.2d 351 (S.D.N.Y. 2001) (finding the mark "1–888–PLUMBING" not generic, but instead descriptive).[51]

■ Plaintiff's 1–800 CONTACTS mark is not descriptive, since it does not convey an immediate idea of the ingredients, qualities, or characteristics of the contact lens products sold by Plaintiff, and neither informs a consumer about qualities, ingredients or characteristics nor points to contact lens' intended purpose,

---

**51.** Defendant argues that "1–800 CONTACTS" is "merely" a phone number that uses the generic term "contacts," and that the 1–800 CONTACTS mark and logo are therefore entitled to protection only against confusingly similar phone numbers. (Memorandum in Opposition at 21–22.) However, the case Defendant cites in support of this argument, *Dial–A–Mattress Franchise Corp. v. Page*, 880 F.2d 675, 678 (2d Cir.1989), does not limit the protection of telephone numbers against trademark infringement solely to "confusingly similar phone numbers." Instead, the court in *Dial–A–Mattress* stated

> [t]he principles limiting protection for the use of generic terms serve to prevent a marketer from appropriating for its exclusive use words that must remain available to competitors to inform their customers as to the nature of the competitor's business or product. These principles do not require that a competitor remain free to confuse the public with a telephone number or the letters identifying that number that are deceptively similar to those of a first user.

> *Id.* at 678.

function or intended use, size, or merit. *Gruner + Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1076 (2d Cir. 1993); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976).

■ Plaintiff's 1–800 CONTACTS mark is clearly suggestive since, although it may take some imagination to grasp that what Plaintiff markets is contact lenses (as opposed to electrical contacts or business contacts), the mark suggests Plaintiff's product. Thus, the Court finds that since Plaintiff's mark is suggestive, it is inherently distinctive and satisfies the first prong of the strength test set forth *supra.*

The 1–800 CONTACTS mark is also distinctive in the marketplace. Plaintiff has invested significant sums in marketing its marks—in 2001, Plaintiff spent $27,118,000 on marketing. (Mathison Dec. at ¶ 7.) Such efforts have generated significant sales—some $169,000,000 worth in 2001. (*Id.*) Over 221,800 people visited Plaintiff's website in the month of September, 2002. (Mathison Dec. at ¶ 9.) These figures are persuasive evidence that Plaintiff has established distinctiveness in the marketplace. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 631 F.Supp. 735, 741 (S.D.N.Y.1985) (evidence of widespread advertising and promotion of defendants' product that featured defendant's mark, continuous use of the mark for more than a century, and sales figures were all rele-

vant to determination of the strength of the mark).

That Plaintiff's mark has gained such an identity is apparent from the fact that Defendant WhenU.com uses Plaintiff's trademarked name in its directory of terms that will "trigger" a pop-up advertisement for eye-care products.[52] Defendant WhenU.com's CEO stated in his affidavit that "[t]he <www.1800contacts.com> web address is included in the eye-care category of WhenU's directory solely for the purpose of identifying consumers who visit the web address as consumers potentially interested in eye care products such as contact lenses." (Naider Aff. at 10). Accordingly, Plaintiff's mark passes the test for being a strong mark.

b. Similarity between Plaintiff's and Defendant's marks [53]

■ "In assessing the similarity of the marks, 'courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'" *Lexington Management Corp. v. Lexington Capital Partners,* 10 F.Supp.2d 271, 279 n. 4 (S.D.N.Y.1998), (quoting *Gruner + Jahr USA Publishing,* 991 F.2d at 1078 (2d Cir.1993)). A court should look not just at "the typewritten and aural similarity of the marks, but [also at] how they are presented in the marketplace" to deter-

---

52. It is also of note here that Defendant Vision Direct registered and maintains a registration for the domain name www.www1800Contacts.com.

53. Traditional cases addressing the question of similarity in the *Polaroid* factors have contemplated that the consumer actually sees or hears the parties' marks or logos, and might confuse the junior mark with the senior mark. In the Internet context, the issue is not whether the WhenU or Vision Direct marks themselves are similar to the Plaintiff's marks, but

whether the marks used by the Defendants (whether actually seen by the consumer or not) are so similar to Plaintiff's mark that that similarity could ultimately cause consumer confusion. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1061 n. 23 (9th Cir.1999) (placement of a trademarked term in metatags, which the court defined as "HTML code not visible to Web users but used by search engines in determining which sites correspond to the keywords entered by a Web user," was actionable use under the Lanham Act).

mine: 1.) whether the similarity between the two marks is likely to cause confusion and 2.) what effect the similarity has upon prospective purchasers." *Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 962 (2d Cir.1996).

Defendant WhenU.com has included the URL address of Plaintiff's website, <www.1800Contacts.com>, in its proprietary directory of terms, (Tr. at 134), so that pop-up advertisements for the website of Defendant Vision Direct and other competitors will appear when computer users enter Plaintiff's URL into the address bar on their Internet browsers. (Tr. at 144–45.) Defendants also use the address www.1800Contacts.com in the advertising of Defendant Vision Direct's products by causing pop-up advertisements to appear when a SaveNow user types the address into an Internet browser.

The website address <www.1800contacts.com>, used by Defendants in the SaveNow proprietary directory of terms incorporates completely the Plaintiff's trademark 1–800 CONTACTS. As used in the WhenU.com directory, Plaintiff's address, <www.1800Contacts.com>, differs from Plaintiff's trademark only in the omission of spaces and grammatical marks, and in the addition of the "www" and ".com." These distinctions are not significant. *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 101–02 (2d Cir.2001) (omission of spaces and addition of domain identifier ".com" or ".net" "are of little or no significance," since "it is necessary in the registration of an internet address to eliminate spaces and possessive punctuation"); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176 (W.D.N.Y.2000) (finding "The Buffalo News" and "thebuffalonews.com," for all intents and purposes, identical); *New York State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.*, 79 F.Supp.2d 331, 340 (S.D.N.Y.1999) (finding "nysscpa.com" nearly identical to "NYSSCPA"); *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, at *8 (S.D.N.Y. Mar.24, 1997) (finding "plannedparenthood.com" nearly identical to "Planned Parenthood"), *aff'd*, 152 F.3d 920 (2d Cir. 1998), cert. denied, 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998).

The similarity of the mark used by Defendants to Plaintiff's 1–800 Contacts mark is clearly relevant and increases the likelihood of confusion. If Defendants used a mark less similar to Plaintiff's mark—for example, "www.contacts.com"—then a SaveNow user who received Defendants' pop-up advertisements after typing into a browser "www.contacts.com" would be less likely to associate Plaintiff's mark with Defendants' pop-up advertisements. Accordingly, the Court finds Plaintiff's mark and the mark used by Defendants to be extremely similar, and that this similarity weighs in favor of a finding of likelihood of confusion.

c. Proximity of the parties' services

■ This factor is satisfied if Plaintiff shows that the parties' products are sufficiently related that customers are likely to confuse the source of origin. *Lexington Management v. Lexington Capital Partners*, 10 F.Supp.2d 271, 284–85 (S.D.N.Y. 1998) (Noting that the Second Circuit has suggested that "the 'proximity of products' factor should be considered together with the 'sophistication of buyers' ") (citing *Cadbury Beverages v. Cott*, 73 F.3d 474, 480 (2d Cir.1996)); *see also Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 449 (S.D.N.Y.1982) (noting that "the closeness of two products is, at least in part, a function of the extent to which purchasers can and do examine and distinguish them").

Here, the service offered by Plaintiff is identical to the service offered by Defen-

dant Vision Direct—both offer replacement contact lenses to consumers over the Internet. Defendant Vision Direct concedes that it is a competitor of Plaintiff. (Mummery Dec. ¶ 2.)

Defendant WhenU.com does not provide a service similar to Plaintiff's, since WhenU.com is a provider of Internet marketing services, and Plaintiff is an Internet retailer of contact lenses. However, it is apparent that WhenU's SaveNow software relies on the close similarity between Plaintiff's services and those of Defendant Vision Direct. At the hearing, WhenU's CEO, Avi Naider, described how the Save-Now software operates to trigger pop-up advertisements—by identifying the category of services provided by 1–800 Contacts, and then retrieving and displaying a pop-up advertisement of a competitor who fits into the same category of services. (Tr. at 65, 144–45.) Clearly, WhenU.com is intentionally benefitting from the fact that Defendant Vision Direct provides services that are substantially the same as Plaintiff's services.

Additionally, analysis of this factor "with an eye to" the likelihood of initial interest confusion adds support to the Court's finding that this factor weighs in favor Plaintiff. The close proximity of services provided by Defendant Vision Direct and Plaintiff increases the likelihood that consumers, having clicked on the pop-up advertisements provided by the SaveNow software, would shift their interest from Plaintiff's website and services to those of Vision Direct. Thus, the close similarity of Defendant Vision Direct's services to Plaintiff's increases the likelihood that, by "piggy-backing" on the good will and reputation of Plaintiff, Defendant's pop-up advertisements might divert potential customers from Plaintiff. Accordingly, this factor tips in favor of Plaintiff.

d. Likelihood that one party will "bridge the gap" into the other's product line

■ "Where the market for competing goods or services is the same, there is no need to consider whether plaintiff will bridge the gap between the markets." *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 133313 at *8 (S.D.N.Y.1997) (declining to consider this factor where both plaintiff and defendant, whose websites were both on the Internet, were "vying for users in the same 'market'") (citing *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 586 (2d Cir.1993) (upholding the district court's finding that, where plaintiff's and defendant's ouzo products "would compete in the same market," the "likelihood-of-bridging-the-gap factor" was irrelevant)). Accordingly, while there is no need to address this factor, were the Court to do so, it is clear it would weigh in Plaintiff's favor.

e. Existence of actual confusion between the marks

■ "Actual confusion" is defined as the likelihood of consumer confusion that enables a seller to pass off his goods as the goods of another. *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir.1993); *Les Ballets Trockadero de Monte Carlo, Inc. v. Trevino*, 945 F.Supp. 563, 571 (S.D.N.Y.1996).

However, "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986); *see also Guinness United Distillers & Vintners v. Anheuser-Bush*, 2002 WL 1543817, *4 (S.D.N.Y.2002) (finding plaintiff's survey, showing only 2%

actual confusion among consumers to weigh in favor of defendant, but nonetheless granting plaintiff's motion for preliminary injunction on the strength of other factors); *Lexington Management Corp. v. Lexington Capital Partners,* 10 F.Supp.2d 271, 286 (S.D.N.Y.1998) (where plaintiff provided no evidence of actual confusion in connection with its motion, this *Polaroid* factor neither supported nor detracted from plaintiff's motion for preliminary injunction).

As evidentiary support for its claim that consumers are likely to be confused by Defendants' pop-up advertisements as to their source, Plaintiff proffered its consumer survey, conducted by William D. Neal. (Pl. Oct. 9.2002 at 19.) The goal of Mr. Neal's survey was to "[d]etermine whether online shoppers who wear or expect to wear contact lenses in the near future, and who have the SaveNow software from WhenU.com installed on their computers, are confused and/or mislead as to the source of SaveNow generated pop-up advertisements." (Neal Aff., Ex. B at 16.) Plaintiff also notes that Defendants, who requested and were granted an opportunity to conduct its own survey, did not conduct one. (Tr. at 371.)

■ Proof of actual confusion, in the form of market research survey evidence, is highly probative of the likelihood of consumer confusion, "subject to the condition that '[t]he survey must ... have been fairly prepared and its results directed to the relevant issues.'" *Schieffelin & Co. v.*

*Jack Co. of Boca, Inc.,* 850 F.Supp. 232, 245 (S.D.N.Y.1994) (quoting *Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir.1984)). However, survey evidence is not required to show actual confusion. *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 964 (2d Cir.1996).

■ The evidentiary value of a consumer survey's results depends upon the underlying objectivity of the survey itself, which is determined by reference to, *inter alia:* whether the proper universe was examined and the representative sample was drawn from that universe; whether the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; whether the questions were leading or suggestive; whether the data gathered was accurately reported; and whether persons conducting the survey were recognized experts. *See Universal City Studios v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984); *SmithKline Beecham Consumer Healthcare v. Johnson & Johnson-Merck,* 2001 WL 588846 at *11 (S.D.N.Y. 2001).

Plaintiff's survey statistics rely on numerous leading questions that suggested their own answers,[54] and that are therefore entitled to little weight in assessing consumer confusion. *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112 (2d Cir.1984) (Responses to survey ques-

---

**54.** Question 4–2 reads, "I believe that anyone should have the right to place .'Pop–Up' advertisements on any website at any time, even if the owner of the website does not authorize or approve it." (Neal Aff., Ex. C at 32.) By suggesting in the second clause that the pop-up ads might be unauthorized, Mr. Neal's survey suggests that they should not be permitted on the website. Question 4–5 reads: "I believe that 'Pop–Up' advertisements are sometimes not sponsored by or authorized by

the website on which they appear." However, Question 9 reads: "Were you aware that, when viewing websites on the Internet, Save-Now software causes 'Pop–Up' advertisements to be displayed on your computer which are not authorized by the website on which they appear?" (Neal Aff., Ex. C at 35.) Since Question 9 flatly states that pop-up ads generated by SaveNow software are unauthorized, the survey itself suggest the answer to Question 4–5.

tion that read, "To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?" were not probative of confusion, because "[a] survey question which begs its answer cannot be a true indicator of the likelihood of consumer confusion.").

Even if these questions are disregarded, the survey is burdened by other flaws. To have substantial probative value, Plaintiff's survey must examine the impression of a junior mark on a potential consumer. *See Conopco v. Cosmair, Inc.*, 49 F.Supp.2d 242, 253 (S.D.N.Y.1999) (citing *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir.1992)). "Typically, trademark infringement surveys use stimuli, such as pictures, advertisements or clothing, that directly expose potential consumers to the products or the marks in question." *Trouble v. Wet Seal, Inc.*, 179 F.Supp.2d 291, 308 (S.D.N.Y.2001). Plaintiff's expert, Mr. Neal, testified that "a specific trademark was not researched" in his survey, (Tr. at 249), and that in the survey he did not show respondents an example of a SaveNow pop-up advertisement prior to drafting the survey. (Tr. at 264.) Mr. Neal's survey also did not ask whether survey respondents had ever seen a SaveNow pop-up ad, (Tr. at 265.), did not attempt to distinguish between SaveNow pop-up ads and other pop-up ads, (Tr. at 266–67), and did not determine whether differences between SaveNow ads and other pop-up ads might have affected users' perceptions of the advertisements provided by SaveNow. (Tr. at 268–69.)

Mr. Neal denied that he was conducting a trademark infringement survey; even so, the survey failed to use any stimulus that would inform consumers as to the competing products or marks in question. Mr. Neal also testified that although he had not provided survey respondents with an example of a SaveNow pop-up adver-

tisement, it was "very reasonable" to assume that SaveNow users would have seen SaveNow pop-up ads. (Tr. at 272.) But this testimony is insufficient to support the leap Plaintiff requires of this Court. First, it does not necessarily follow that all survey respondents who had the SaveNow software on their computers saw SaveNow advertisements. (Tr. at 303.) Second, even if survey respondents who had Save-Now on their computers had seen Save-Now ads, it does not necessarily follow that those respondents were thinking of the SaveNow ads they had seen when they answered the survey questions from recall. (Tr. at 303.) Finally, since survey respondents answered questions about pop-up advertisements generally, it is just as "reasonable" to assume that they were thinking about pop-up advertisements from other sources when they answered the survey. Accordingly, Mr. Neal's survey, as designed and carried out, is not dispositive of whether pop-up advertisements generated by the SaveNow software has caused actual confusion among SaveNow users, and is not evidence of actual confusion.

However, Mr. Neal's survey is at least suggestive of the likelihood of initial interest confusion. The survey results indicate that 68% of 490 surveyed SaveNow users did not know that they had the SaveNow software on their computers, that 76% of those who knew the SaveNow software was on their computers were unaware of what the SaveNow software does, that 59% of SaveNow users believed that "pop-up advertisements are placed on the website on which they appear by the owners of that website," and that 52% of all users believed "pop-up advertisements have been pre-screened and approved by the website on which they appear." (Neal Aff. ¶ 7.) The fact that a significant number of SaveNow users may believe that pop-up advertisements are associated with the

owner of the website on which it appears is relevant to the likelihood of initial interest confusion, since this means a consumer is likely to associate a Vision Direct pop-up advertisement generated by the SaveNow program with the 1800–Contacts websites on which it appeared.

It seems likely that a SaveNow user, thinking the Vision Direct pop-up advertisement generated by SaveNow was part of the 1–800 Contacts website, might be lured into clicking on the Vision Direct SaveNow pop-up advertisement, which would result in the user's main browser window shifting to Vision Direct's website, making likely that the consumer's attention and interest would shift to Vision Direct's website, and that ultimately the consumer would purchase products from Vision Direct, instead of from 1–800 Contacts. Although the survey does not show that a SaveNow user who receives a Vision Direct pop-up advertisement is likely to click on it, nor that a consumer who is diverted from the 1–800 Contacts website to the Vision Direct website is likely to purchase products from the Vision Direct website, this only reduces the *weight* of the survey evidence in establishing a risk of initial interest confusion. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir.1986) ("While the complete absence of actual confusion evidence after a significant period of competition may weigh in a defendant's favor, such an inference is unjustified in the instant case in view of the survey evidence, even with its methodological defects. While these defects go to the weight of the survey, it is still somewhat probative of actual confusion in the post-sale context.") Nonetheless, the survey is supportive of the likelihood of initial interest confusion.

In view of the foregoing, the Court finds that the evidence does not support a finding of actual source confusion; however, in view of the survey's weak probative value in establishing the likelihood of initial interest confusion, this factor weighs in favor of neither Defendant nor Plaintiff.

Of course, since actual confusion is only one of the eight factors considered under *Polaroid,* that Plaintiff has not presented evidence of actual source confusion does not require a finding of no likelihood of confusion. The *Mobil Oil* court upheld the lower court where the district judge

> found a likelihood of confusion not in the fact that a third party would do business with [defendant] believing it related to [plaintiff], but rather in the likelihood that [defendant] would gain crucial credibility during the initial phases of a deal. For example, an oil trader might listen to a cold phone call from [defendant]—an admittedly oft used procedure in the oil trading business—when otherwise he might not, because of the possibility that [defendant] is related to [plaintiff].

818 F.2d at 259.

Thus, while 1–800 Contacts' survey evidence is methodologically insufficient to show that a third party would do business with Vision Direct believing Vision Direct's advertisements (placed by WhenU's software) are related to 1–800 Contacts, this is not determinative of whether Plaintiff has established a *likelihood* of confusion generally.

### f. Bad faith of the Defendant in using the mark

■■■ In analyzing the "bad faith" factor, the question is whether Defendants used Plaintiff's mark with the "intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 583 (2d Cir.1991) (quoting *Edison Brothers Stores, Inc. v. Cosmair, Inc.,* 651

F.Supp. 1547, 1560 (S.D.N.Y.1987)). It is apparent that Defendants here did not "innocently select" Plaintiff's 1–800 CONTACTS mark for inclusion in its proprietary directory of terms. Instead, WhenU.com's president and CEO testified and affirmed in a sworn affidavit that the 1–800 CONTACTS trademark was included in the WhenU.com proprietary directory. (Tr. at 134.)

Actual or constructive knowledge of a trademark owner's exclusive right to use a registered mark may signal bad faith. *Mobil Oil* at 259. Here, Defendant WhenU.com has knowingly included Plaintiff's mark in the SaveNow proprietary software directory, to increase the competitive advantage of Defendant Vision Direct. Such knowing use of Plaintiff's mark supports a finding of bad faith. Accordingly, this factor tips in favor of Plaintiff.

g. Quality of the Defendant's services

The quality of Defendant's product may be relevant because:

(1) an inferior product may cause injury to the plaintiff trademark owner because people may think that the senior and junior products came from the same source; or (2) products of equal quality may tend to create confusion as to source because of this very similarity.

*Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497, 505 (2d Cir.1996).

Plaintiff notes that "Defendants' services may or may not have the same quality as Plaintiff's services," but argues that the fact that Defendant's services are of comparable quality may confuse customers further, "precisely because the services are so similar." (Pl. Oct. 9, 2002 at 22.) However, here there is no evidence regarding the quality of Defendant's products. Without evidence, this factor could cut in favor of either Defendants or Plaintiff, *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d 410, 420 (S.D.N.Y.2002), and accordingly the Court finds it to be of assistance to neither Plaintiff nor Defendants.

h. Sophistication of the Consumers

Plaintiff argues that the level of care and attention paid by consumers on the Internet is diminished, and that therefore this factor cuts in Plaintiff's favor, as the likelihood of confusion will be high. (Pl. Oct. 9, 2002 at 23.) (citing *Something Old, Something New, Inc. v. QVC, Inc.*, 53 U.S.P.Q.2d 1715, 1724 (S.D.N.Y.1999)). In *Something Old, Something New*, the court considered the sophistication of consumers purchasing goods from a cable television and website home shopping network and found that "[a]rguably, home shoppers are more subject to impulse buying than store shoppers; the product can be easily glorified and the consequence of the purchase can be masked." *Id.* By contrast, here there are no passive couch-potato consumers. Internet shoppers have a specific product in mind when they go online and have the ability to navigate the Internet to get what they want. Moreover, in the mixed publishing/retailing context of the Internet, (Tr. at 88–90), only a few clicks of a mouse by the consumer separates a pop-up advertisement from an actual purchase by that consumer. Thus, consumers who have typed Plaintiff's <1800Contacts.com> URL into the browser bar are clearly searching for contact lens products, and expect to be able to complete a transaction with Plaintiff in a short span of time, with little effort or transaction costs.

However, whether or not consumers of replacement contact lenses on the Internet are "sophisticated" will not change the harm that flows from initial interest confusion, since that harm arises when consumers' interest is diverted from Plaintiff's products by association of Plaintiff's trademark with Defendants' products. Since

the harm from initial interest confusion does not depend on actual confusion, the sophistication of consumers does not mitigate the likelihood of initial interest confusion. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir.1987) (upholding a finding of trademark infringement where defendant's use of plaintiff's mark made probable "that potential purchasers would be misled into an initial interest" in defendant competitor's product, despite the sophistication of the consumers); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986) (sophistication of the buyers of expensive designer blue jeans contributed to, rather than prevented, initial interest confusion caused by infringer's use of trademark stitching patterns substantially similar to mark owner's, since sophisticated jeans consumers would be more likely to assume some sort of association between the mark-owner and the infringer); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway and Sons*, 523 F.2d 1331, 1342 (2d Cir.1975); *New York State Soc. of Certified Public Accountants v. Eric Louis Associates, Inc.*, 79 F.Supp.2d 331, 341–42 (S.D.N.Y.1999) (sophistication of consumers does not mitigate initial interest confusion, since sophisticated consumers are as likely to be initially confused as unsophisticated consumers); *Kompan A.S. v. Park Structures, Inc.*, 890 F.Supp. 1167 (N.D.N.Y.1995) (holding that the sophistication of purchasers of expensive playground equipment does not prevent initial confusion caused by defendants copying of plaintiff's trade dress).

The fact that Defendants' pop-up advertisement for competing Internet contact lenses retailers appears shortly after a consumer types into the browser bar Plaintiff's trademarked name and accesses Plaintiff's homepage increases the likelihood that a consumer might assume Defendants' pop-up advertisements are endorsed or licensed by Plaintiff, since the user will first see the 1–800 Contacts website, with logos and graphics, and then will see the pop-up advertisement. *Planned Parenthood Fed'n. of Amer., Inc. v. Bucci*, 1997 WL 133313, *8 (S.D.N.Y.1997) (plaintiff's mark appeared during a short delay while trademark infringer's homepage loaded, increasing the likelihood that Internet users would believe they had accessed plaintiff's website). Even if a consumer who clicked on Defendants' pop-up advertisements and accessed Defendant Vision Direct's website eventually realized—prior to purchasing anything—that Vision Direct's website was not related to Plaintiff, the consumer might then proceed to purchase replacement contacts on Vision Direct's website, instead of taking the steps necessary to return to Plaintiff's website. *Bihari v. Gross* 119 F.Supp.2d 309, 319 (S.D.N.Y.2000); *BigStar Entm't, Inc. v. Next Big Star*, 105 F.Supp.2d 185, 207 (S.D.N.Y.2000). Accordingly, this factor weighs in favor of the Plaintiff.

i. Other Factors: Branding by WhenU. com

Defendant WhenU.com argues that it has taken steps to ensure effectively there will be no confusion among consumers as to the source of the pop-up advertisements. Advertisement windows generated by Defendant WhenU's SaveNow software are "branded"—a green "$" mark and the text "SaveNow!" are affixed to the top of the window. (Naider Aff. ¶ 42; Memo in Opposition at 11.) On the upper right-hand corner of the SaveNow ad windows, next to the "X" symbol that typically closes windows, is a "?" symbol that, when clicked, opens a new window containing an explanation of the SaveNow software and a direct link to a page with more detailed information for removing or "uninstalling" the software. (Memo in Opposition at 11.) At the bottom right of the advertisement window is text stating: "A WhenU offer—click ? for info." (Memo in Opposition at

11[55] (citing *Upjohn Co. v. AHPC*, 598 F.Supp. 550, 561–62 (S.D.N.Y.1984))).

WhenU.com argues that its disclaimers are "the preferred way of alleviating consumer confusion." (WhenU.com Memorandum at 23). WhenU.com argues further that, "unlike the use of trademarks in metatags to "trick" consumers into believing that a website is in fact the website that they intended to visit, where ... consumers see both the website they accessed as well as WhenU's clearly labelled ad, they are not likely to be confused." (Memorandum in Opposition at 24, n. 14 (citing *Bihari v. Gross*, 119 F.Supp.2d 309, 321–322 (S.D.N.Y.2000))).

While the Second Circuit has "found the use of disclaimers to be an adequate remedy when they are sufficient to avoid substantially the risk of consumer confusion," it is also important to note that "each case must be judged by considering the circumstances of the relevant business and its consumers." *See Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315 (2d Cir.1987).

Here, consumer confusion caused by the pop-up advertisements can hardly be alleviated by WhenU's use of disclaimers with terms that are buried in other web pages, requiring viewers to scroll down or click on a link. Moreover, Defendant "has failed to come forth with any evidence whatsoever to support its contention that the disclaimer would reduce consumer confusion." *Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1324 (2d Cir.1987). The burden imposed upon Defendants to "come forward with evidence sufficient to demonstrate that [its

disclaimers] would significantly reduce the likelihood of consumer confusion" is a heavy one. *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311 (2d Cir.1987).

Even if Defendants had offered evidence of the effect of its branding and disclaimers, such evidence would do little to counter Plaintiff's showing of the likelihood of initial interest confusion. *OBH, Inc. v. Spotlight Magazine Inc.*, 86 F.Supp.2d 176, 190 (W.D.N.Y.2000) (rejecting disclaimer defense because defendant's disclaimer could not remedy initial interest confusion caused by defendant's use of plaintiff's mark on its website); *NYS Soc'y of CPAs v. Eric Louis Associates*, 79 F.Supp.2d 331 (S.D.N.Y.1999) (same); *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313 (S.D.N.Y.1997) (same); *cf. Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir.1986) (finding a likelihood of confusion in the post-sale context, and finding that "[a]ppellants' labeling in no way dispels the likelihood that consumers will conclude that appellants' jeans are somehow connected to appellee by virtue of the nearly identical stitching patterns").

Accordingly, Defendant WhenU's use of the "Save!" brand, the "A WhenU ad" brand, and the license agreement on installation do not alleviate Plaintiff's showing of a likelihood of confusion.

In sum, as discussed above, the *Polaroid* factors weigh heavily in favor of the Plaintiff's showing a likelihood of both source confusion and initial interest confusion. Having established a likelihood of confusion, Plaintiff has established both a likeli-

---

55. As noted above, in December 2002, subsequent to the filing of this lawsuit, WhenU.com replaced this text with a new disclaimer, stating: "This is a WhenU offer and is not sponsored or displayed by the websites you are visiting. *More* ...," (Memo in Opposition at 10). However, since "there is no guarantee

that Defendants will not simply return to the same conduct if the case is dismissed without issuance of an injunction," the Court considers the disclaimers as they appeared at the time the action was filed. *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 186 n. 8 (W.D.N.Y.2000).

hood of success on the merits and irreparable harm on its trademark infringement claim. *Hasbro, Inc. v. Lanard Toys. Ltd.*, 858 F.2d 70, 73 (2d Cir.1988).

## C. Cybersquatting

■ The Second Circuit has described cybersquatting as follows:

> Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners. Since domain name registrars do not check to see whether a domain name request is related to existing trademarks, it has been simple and inexpensive for any person to register as domain names the marks of established companies. This prevents use of the domain name by the mark owners, who not infrequently have been willing to pay 'ransom' in order to get 'their names' back.

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 493 (2d Cir.2000)

In passing the Anticybersquatting Consumer Protection Act ("ACPA"), Pub.L. No. 106–113 (1999), Congress provided a federal remedy for cybersquatting. 15 U.S.C. § 1125(d)(1)(A) provides

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—
> (i)has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> (ii) registers, traffics in, or uses a domain name that

> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> (II) in the case of a famous mark that is famous at the time of the registration of the domain name, is identical or confusingly similar to or dilutive of that mark; ...

15 U.S.C. § 1125(d)(1)(A).

"[A] court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).

Plaintiff 1–800 Contacts has continuously used its marks in commerce since its inception in 1995. (Mathison Aff. ¶ 6.) Defendant Vision Direct registered[56] and maintains its registration in the domain name www.www1800Contacts.com. (Barrier Aff. Ex. A.) Plaintiff argues that this domain name is "almost identical" to Plaintiff's www.1-800Contacts.com website domain name, and that Defendant Vision Direct registered and maintains the www.www1800Contacts.com domain name with the bad faith intent to divert consumers from the 1–800 Contacts website to Defendant Vision Direct's website, and to profit from the use of Plaintiff's mark. (Pl. 10/9/02 at 32.) Vision Direct has not addressed these arguments.

The Court has already concluded that the 1–800 Contacts mark is suggestive, and also distinctive. See Discussion, *supra.*

The domain name registered by Defendant Vision Direct, www.www1800Contacts.com, differs from Plaintiff's 1–800 Contacts mark in the addition of the web prefix "www" and the omission of spaces. These distinctions are not significant.[57]

The statute provides that

---

**56.** It appears from that the registration occurred sometime in 2002. (Barrier Aff. Ex. A.)

**57.** See discussion, *infra*, p. 497.

In determining whether a person has a bad faith intent described under subparagraph (a), a court may consider factors such as, but not limited to ·

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

* * * *

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section. ·

15 U.S.C. § 1125(d)(1)(B)(i).

Relying on these factors, it is apparent that Vision Direct has acted with bad faith. Vision Direct has no trademark rights in the domain name, is not identified by the domain name, has not demonstrated any prior bona fide use of the domain name or any site accessible using the domain name—accordingly, these factors weigh in favor of the Plaintiff. 15 U.S.C. § 1125(d)(1)(B)(i)(I-IV). Defendant Vision

Direct and Plaintiff are competitors, offering virtually identical services over the Internet—this alone tends to show that Vision Direct has registered the www.www1800Contacts.com domain name with the "intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(i)(V).

Accordingly, the Court finds sufficient evidence to establish the bad faith of Defendant Vision Direct in registering and maintaining the www.www1800Contacts.com domain name. Based on the foregoing, Plaintiff has established a likelihood of success on its Cybersquatting claims.

■ Some district courts have found the trademark infringment principle applies in cybersquatting actions under the ACPA—that irreparable harm may be caused by the improper registration, trafficking or use of a confusingly similar domain name. *E.g. Advance Magazine Publishers Inc. v. Vogue Int'l*, 123 F.Supp.2d 790, 801 (D.N.J.2000) (citing *Shields v. Zuccarini*, 89 F.Supp.2d 634, 641 (E.D.Pa. 2000)). However, other courts have not applied this principle, and have required a showing of irreparable harm to the plaintiff. *E.g., BroadBridge Media, L.L.C. v. Hypercd.com*, 106 F.Supp.2d 505, 509–10 (S.D.N.Y.2000). The Second Circuit has not weighed in on the distinction between irreparable harm for purposes of trademark infringement claims and cybersquatting claims. This Court joins the courts that find irreparable harm may be presumed on a motion for a preliminary injunction in a cybersquatting case where a

plaintiff has shown a likelihood of success on the merits.[58] Accordingly, issuance of a preliminary injunction against Defendant Vision Direct's use of the domain name www.www1800Contacts.com is appropriate.

D. Mootness

■■■■ Defendant Vision Direct argues it should not be preliminarily enjoined in this case because any grounds for relief that Plaintiff may have had prior to the filing of the lawsuit have been mooted.[59] (Vision Direct Jan. 31, 2003 at 3.) Vision Direct notes that it voluntarily instructed its co-defendant, WhenU.com, to cease placing "pop-up" ads on Plaintiff's website three weeks before this action was filed,[60] and claims it has no intention of resuming use of the offending pop-up advertising. (*Id.* at 2–3; Mummery Dec. ¶ 7, 8.) Vision Direct also notes that it sued Coastal Contacts for substantially the same conduct in 02–Civ–9788. (Vision Direct Jan. 31, 2003 at 3.)

Although Vision Direct may have ceased its use of the complained-of pop-up advertisements, the Court nonetheless has authority to issue a preliminary injunction. *See Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 701 (2d Cir. 1961) (Injunction issued against future infringement although the defendant discontinued the use of offending labels, since the defendant continued to dispute the validity of the trademark); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894,

97 L.Ed. 1303 (1953) ("[t]he court's power to grant injunctive relief survives discontinuance of the illegal conduct" since the "purpose of an injunction is to prevent future conduct"). Moreover, since here there is little to support a conclusion that use by Defendant Vision Direct of pop-up advertisements will not reoccur, the Court rejects Defendant's claim that a preliminary injunction should not issue merely because Defendant has ceased the offending conduct. *E.g.*, *United Farm Workers v. Sloan's Supermarkets, Inc.*, 352 F.Supp. 1025, 1028–29 (S.D.N.Y.1972); *Consumers Union of United States, Inc. v. Theodore Hamm Brewing Co.*, 314 F.Supp. 697, 701 (D.Conn.1970); *Consumers Union of United States, Inc. v. Admiral Corp.*, 186 F.Supp. 800, 801 (S.D.N.Y.1960).

Vision Direct's claim that "no likelihood exists that Vision Direct will resume causing pop-up advertisements to appear on 1–800's web pages" is supported by nothing more than the affidavit of Ian Mummery stating that "Vision Direct has no intention of again participating in pop-up advertising." (Mummery Dec. at ¶ 8.) This avowed lack of "intention" to participate is a far cry from a guarantee by Vision Direct that it will not participate in pop-up advertising in the future. Here, Vision Direct has not convinced the Court that it has voluntarily done "everything within its power" to ensure that "there is not even a slight danger that it would now turn around and embark upon another course of deceptive conduct." *Twentieth Century*

58. It is not insignificant that Congress chose to make the ACPA part of the Lanham Act, and for purposes of preliminary injunctions on trademark infringement claims under the Lanham Act, irreparable harm is presumed upon a finding of a likelihood of confusion.

59. Arguing "[i]f a defendant voluntarily ceases the complained-of activities, a preliminary injunction request is moot when there is no reasonable expectation that the complained-of

activities will resume in the future," Defendant Vision Direct cites *American Express Travel Related Services, Inc. v. MasterCard International, Inc.*, 776 F.Supp. 787, 790–91 (S.D.N.Y.1991); *Upjohn v. American Home Products Corp.*, 598 F.Supp. at 550, 554–55. (Vision Direct Jan. 31, 2003 at 3.)

60. Defendant alleges that it voluntarily ceased its pop-up advertising activities on September 17, 2002. (Mummery Dec. ¶ 7, 8.)

*Fox v. Suarez Corp.*, 1998 WL 126065, \*3–5 (S.D.N.Y.1998)(denying preliminary injunction where defendant voluntarily changed website and attempted to cancel 42 advertisements, and "[p]laintiff ... specifically conceded that the defendant [did] everything within its power to cancel all advertisements").

Vision Direct argues that the balance of the hardships weighs in favor of denying the injunction, because of the harm to its reputation that will result from the imposition of a preliminary injunction against it. In support of its argument, Vision Direct cites *United Farm Workers v. Sloan's Supermarkets, Inc.*, 352 F.Supp. at 1028–29. In *Sloan's*, the court acknowledged that "a preliminary injunction is not precluded merely because the action complained of has ceased, or because it was inadvertent, or because the defendant has sworn it will not happen again, or because the defendant might suffer some harm from the injunction," but held that the balance of harms tipped in favor of denying a preliminary injunction where "[t]he mere announcement to the public that [defendant] had been preliminarily enjoined ... would convey an incorrect impression of the defendant's position with regard to the plaintiff union; would misrepresent its good faith efforts; and would likely do considerable injury to its general business reputation which is not presently justified by the record".

However, here Vision Direct has offered only statements by Ian Mummery, that

> [a] preliminary injunction against Vision Direct would undoubtedly damage it, possibly irreparably. Vision Direct's reputation is unblemished and must remain so if Vision Direct is to continue its spectacular success. Customers will undoubtedly be hesitent [sic] to purchase contact lenses from a company that has been enjoined.

(Mummery Dec. ¶ 9.)

Mr. Mummery provides no basis for his conclusions about what "undoubtedly" might happen. Notwithstanding his speculation, it is far from clear that enjoining Defendant Vision Direct from placing pop-up advertisements on Plaintiff's website will have any effect at all on sales by Vision Direct. Accordingly, these statements are insufficient to sustain Vision Direct's burden of showing that a preliminary injunction will harm its good will and reputation.

### E. Other Claims

Plaintiff advances several other related theories under the Lanham Act and state law, in support of its Motion for Preliminary Injunction. As none of those theories, if established, would entitle plaintiff to greater relief" than that appropriate under its infringement and cybersquatting claims, "there is no need to consider them." *E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*, 90 F.Supp.2d 277, 298 (S.D.N.Y.2000).

### F. Remedies

Defendant uses Plaintiff's mark within the meaning of the Lanham Act by causing pop-up advertisements to appear when SaveNow users have specifically attempted to find or access Plaintiff's website, by either typing Plaintiff's web address into the browser bar or by typing the Plaintiff's mark into a search engine. Defendant also uses Plaintiff's mark by including Plaintiff's mark and confusingly similar terms as elements in the proprietary SaveNow directory. These uses are likely to cause source confusion and initial interest confusion.

As Professor Deighton noted, the distinction between marketing and publishing

may be diminishing in the context of the unique environment of the Internet. (Tr. at 88–90.) On the other hand, technological advances should not trample on the traditionally-protected rights established by the trademark infringement laws. On the Internet, online shoppers have a myriad of competing retailers literally at their fingertips, are easily able to research preferences, and with very little time and effort are able to enact their preferences with purchases. In this context, the good will and reputation that Plaintiff and other online retailers have established is of extreme importance. Plaintiff has spent considerable sums to establish and maintain its marks' notoriety with online consumers, and is entitled to protect this investment from conduct that infringes those marks. An online shopper who has knowledge of Plaintiff's mark and an interest sufficient to choose to visit or find Plaintiff's website is a potential buyer that Plaintiff is entitled to protect from confusion.

Enjoining the Defendants from triggering pop-up advertisements when SaveNow users type in Plaintiff's website address and/or type Plaintiff's mark into a search engine will prevent Defendants from capitalizing on the goodwill and reputation that Plaintiff has earned through its own investment. Such an injunction will eliminate the likelihood that a SaveNow user will be confused as to the source of the pop-up advertisements that appear when the 1–800 Contacts website is accessed; it will also eliminate the likelihood that a SaveNow user would be lured from Plaintiff's website to Defendant Vision Direct's website in the initial phases of the user's attempts to shop for contact lens products on Plaintiff's website.

Of course, an injunction should not impede traffic in the more general free-for-all of the Internet superhighway, where general information is often sought. For example, a SaveNow user who enters a generic term such as "contact lenses" into a search engine is clearly looking for general information, and has not exhibited any preference for 1–800 Contacts. Plaintiff's website, as well as Defendant Vision Direct's website, may appear on the results page of the search engine along with other contact lens retailers and manufacturers. In this environment, all contact lens retailers including Plaintiff and Defendant Vision Direct, are "on the same page," and the unique interplay of publishing and marketing provided by the technology of the Internet should be given free reign.

Accordingly, it is appropriate that Defendants be preliminarily enjoined from using Plaintiff's mark or confusingly similar terms as an element in the SaveNow proprietary directory. It is also appropriate that Defendants be preliminarily enjoined from causing pop-up advertisements to appear when a computer user has made a specific choice to access or find Plaintiff's website by typing Plaintiff's mark into the URL bar of a web browser or into an Internet search engine.

Since it is likely that Plaintiff will succeed in its claims that Defendant Vision Direct registered and maintained a registration of the domain name www.www1800Contacts.com, that the domain name is confusingly similar to Plaintiff's 1800Contacts mark, and that the registration and maintenance of registration was in bad faith, it is also appropriate that Defendant Vision Direct be and hereby is ORDERED to cancel its registration of the domain name www.www1800Contacts.com.

### III. CONCLUSION

For the foregoing reasons, 1–800 Contacts' Motion for a preliminary injunction is GRANTED in part and in DENIED in part.

Defendants are preliminarily enjoined from: 1) including the 1–800 Contacts mark, and confusingly similar terms, as elements in the SaveNow software directory, and 2) displaying Plaintiff's mark "in the ... advertising of" Defendant Vision Direct's services, by causing Defendant Vision Direct's pop-up advertisements to appear when a computer user has made a specific choice to access or find Plaintiff's website by typing Plaintiff's mark into the URL bar of a web browser or into an Internet search engine. Within 30 days of the date of this Order, Defendants SHALL effect this injunction.

Plaintiff's Motion for preliminary injunctive relief on its cybersquatting claims is GRANTED. Defendant Vision Direct shall within 30 days of the date of this Order cancel its registration of the www.www1800Contacts.com domain name.

Plaintiff's Motion for preliminary injunctive relief on its copyright claims is DENIED.

The parties shall appear before the Court for a case conference on January 16, 2004 at 11:00 AM.

SO ORDERED.